HENRY C. HEINZ, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 55480. Promulgated June 6, 1933.

*D. J. Gantt, Esq.*, for the petitioner.
*George D. Brabson, Esq.*, for the respondent.

OPINION.

TRAMMELL: *Issue 1.*—The petitioner loaned the sum of $5,000 to the Piedmont Hotel Operating Co. on December 22, 1927, for the purpose of paying taxes of said company. Each of petitioner's associates advanced a like sum for the same purpose, under the circumstances set out in our findings of fact above. Petitioner alleges that in 1928 he ascertained that this debt was worthless, charged it off and subsequently claimed a deduction therefor in his return for 1928. The respondent disallowed said deduction on the ground that the debt became worthless in the prior year, 1927.

It is not shown what assets, if any, the operating corporation had, but the record discloses that each year it sustained a substantial deficit, which it could not pay and which it was necessary for the petitioner and his two associates in the venture to make good. At the end of 1926 the petitioner's one-third share of the accumulated deficit was $31,333.33, which amount he paid and claimed as a deduction in his return for that year. This deduction was allowed by the respondent. These facts, we think, can support no other conclusion than that in 1927 when the subsequent advance of $5,000 to the corporation was made, the corporation was insolvent and unable to pay its debts and was without any reasonable prospect of being able to do so in the future. It is equally clear that the facts were known to the petitioner at that time. Under these circumstances, we cannot hold that the deduction, if allowable, could be postponed until the next year.

A taxpayer in possession of all the material facts is not permitted to make a formal determination of worthlessness, charge off the debt and claim a deduction on that account subsequent to the year in which the debt actually became worthless. The rule, and the reasons which require it, were stated by the Circuit Court of

Appeals for the Fifth Circuit in *Avery* v. *Commissioner*, 22 Fed. (2d) 6; affirming 5 B.T.A. 872, as follows:

The reasonable interpretation of the law is that, in order to secure a deduction of worthless debts, they must be charged off in the year they are ascertained to be worthless. A man is presumed to know what a reasonable person ought to know from facts brought to his attention. A taxpayer should not be permitted to close his eyes to the obvious, and to carry accounts on his books as good when in fact they are worthless, and then deduct them in a year subsequent to the one in which he must be presumed to have ascertained their worthlessness. To do so would enable him to withhold deductions in his less prosperous years, when they would have little effect in reducing his taxes, and then to apply the accumulation at another time to the detriment of the fisc. This would defeat the intent and purpose of the law.

The petitioner argues that he would not have been justified in ascertaining the debt in question to be worthless in 1927 when the loan was made, for the reason that it was then hoped by all that the hotel business would improve in 1928 so that the corporation would be enabled to pay its debts. However, it is not shown that any facts were known in December 1927, which would reasonably have indicated such hoped-for results. At that time the three stockholders of the corporation had already advanced $109,000 to cover its prior operating deficits over a four-year period, in none of which years did the corporation have net earnings. The corporation's past history did not encourage hope for the future in that respect, and it did in fact during 1928 sustain a further operating deficit in the amount of approximately $55,556.07. As we said in *Joseph H. Rudiger*, 22 B.T.A. 204:

The bare hope that something might turn up in the future that would permit petitioner to recover constitutes no sound reason for postponing the time for taking a deduction for a loss that has been clearly sustained.

See also *Audubon Park Realty Co.*, 6 B.T.A. 875; *Simon Kohn*, 8 B.T.A. 547; *Ralph H. Cross*, 20 B.T.A. 929; affd., 54 Fed. (2d) 781; *Louis D. Beaumont*, 25 B.T.A. 474; *Miles G. Saunders*, 26 B.T.A. 519.

The respondent's action on the first issue is approved.

*Issue 2.*—The petitioner, who is on the cash receipts and disbursements basis, assigns as error the action of the respondent in including in gross income for the taxable year 1928 the amount of $4,391.60 received by the petitioner personally from a syndicate of which he was a member on February 26, 1929, on account of "interest and dividend adjustments."

Early in 1928 the petitioner became a member of a syndicate or partnership organized to deal in Coca-Cola stock. The syndicate discontinued operations in November 1928, but did not get its affairs wound up and distribution made to its members until subsequent to January 1, 1929.

Respecting the character of the syndicate or partnership, petitioner testified at the hearing as follows:

Q. * * * Now, as a matter of fact, the syndicate was nothing more or less than a joint venture, wasn't it, or a partnership?
A. It might be termed that.
Q. You were to share the losses or share the profits, as the case might be?
A. Yes, sir.
Q. In accordance with your respective holdings?
A. Yes, sir.

Petitioner argues in his brief that the syndicate of which he was a member was not a partnership, but a joint adventure. In our opinion, the distinction is immaterial, in so far as it bears on the issue under the facts presented here. The rule is established by statute, and the petitioner does not contend to the contrary, that if the syndicate was in reality a partnership under another name, the partners were taxable on their respective distributive shares of the partnership net income, whether or not distributed to them in the taxable year. Sec. 182 (a), Revenue Act of 1928.

If the syndicate was a joint adventure and not a partnership, then under the facts disclosed here, the petitioner's distributive share of the profits, which he became entitled to receive in 1928, constituted taxable income to him for said year.

The syndicate in November 1928 ceased to carry on the business for which it was organized, and thereafter proceeded to wind up its affairs and distribute its earnings among its members. Prior to the close of 1928, all events had transpired which fixed the amount of the net income distributable to the petitioner. The fact that the syndicate manager was busy with other matters, or did not find it convenient for any reason to audit the syndicate accounts and determine the exact amount to which petitioner was entitled and turn over said amount to the petitioner personally, is immaterial.

Even though the petitioner is on the cash basis, he is not entitled to defer to 1929 the reporting of his distributive share of the net earnings of the syndicate for 1928 merely because the manager of the syndicate refrained from ascertaining the amount and making distribution thereof in 1928.

In our opinion, there is no more reason to hold otherwise than to say that the petitioner might defer reporting as income the net profit derived from a transaction conducted by himself personally where he had refrained from ascertaining the exact amount of the profit so derived until a subsequent year.

In reaching the conclusions in the present proceeding above indicated, we are not unmindful of the recent decisions of the Circuit Court of Appeals for the Second Circuit in *Wild* v. *Commissioner*, 62 Fed. (2d) 777, and *Glenmore Securities Corp.* v. *Commissioner*,

62 Fed. (2d) 780, where it was held that the realized profit of a syndicate, similar in many respects to the one involved here, constituted taxable income to the members only in the year when actually distributed to them. However, those cases, we think, are distinguishable from the instant proceeding in that the income there in controversy had been accumulated or retained by the manager of the syndicate for future investment or eventual distribution.

The facts are sufficiently indicated by the following statements contained in the court's opinion in the *Wild* case:

> The question raised by this appeal is whether the earned, but undistributed, income of a member of an investment "syndicate" using contributions of its members to buy, hold and sell securities and land, is taxable. The taxpayer's position is that he need return only what is actually distributed by the "syndicate manager;" the Commissioner that the syndicate was a partnership, and that its realized profits were taxable income of the members, though retained by the manager for future investment, or eventual distribution. * * *
>
> Sixteen individuals united in a contract, as parties of the first part, with a corporation, as party of the second. The corporation was to be the "manager", though it was also a subscriber. The purpose was to buy and hold shares and bonds of a company which owned real estate. The members promised to pay their subscriptions, which were of unequal amounts, as the manager might call; if they defaulted the manager might advance the call, which was to be then treated as a loan. These funds the manager was to use to buy, and "manage", the shares and bonds of the realty company, and for whatever else it thought "advisable," putting the securities in its own name, if it chose, pledging them, voting upon them, and acting as shareholder. The syndicate was to last until the manager ended the venture at its pleasure, when it should distribute all the capital and profits, though it might make "partial distribution" earlier. Upon distribution the manager was first to take its expenses, next repay the contributions to each member with 6 per cent., and divide the balance as profit, one part to itself and three to the members in proportion to their contributions.

The undistributed profits in controversy in the above cited cases were not available to the syndicate members in the taxable years, for the reason that under the agreement distributions prior to termination of the operations of the syndicate was a matter exclusively within the discretion of the manager, and in the exercise of that discretion the profits in controversy were being held for future investment, or, if not so invested, then for eventual distribution.

In the instant case, the business operations of the syndicate were terminated on November 16, 1928, and thereafter the income in question was at the unqualified demand of the petitioner. True, the exact amount thereof, for some undisclosed reason, was not determined and distributed by the syndicate manager until after January 1, 1929, but this was apparently only a matter of bookkeeping. The syndicate's operations had been terminated on the date above stated, and all events had then transpired which fixed the distributive share of income to which the petitioner was entitled. There-

after, the syndicate manager had no discretion to accumulate or retain the realized profits for future investment or eventual distribution. The amount to which the petitioner was then entitled was no longer at the risk of the enterprise, but he had a legal right to its immediate possession and unrestricted use.

Respondent's action on the second issue is approved.

*Issue 3.*—In 1928 the petitioner delivered to the syndicate above referred to 1,000 shares of Coca-Cola stock, endorsed in blank or otherwise transferred to the syndicate or a nominee, and in writing authorized the syndicate to buy and sell on his account to the best advantage, solely in its discretion. The stock so turned over to the syndicate included 100 shares purchased by the petitioner in 1920 and 100 shares issued to him as a stock dividend. The remaining 800 shares were acquired by the petitioner subsequent to said purchase in 1920 and subsequent to his receipt of the stock dividend. There was no earmarking or identification by which any of the shares delivered by the petitioner to the syndicate could be differentiated from any other similar shares. There was no restriction in writing placed upon the use of the shares by the syndicate, although petitioner testified he requested the manager of the syndicate orally not to sell or dispose of the 200 shares first acquired by him.

The syndicate sold 800 shares of the stock in November 1928, and remitted the proceeds to the petitioner, the amount of which is not in controversy. The syndicate then purchased on the market 45 shares of Coca-Cola stock and returned to the petitioner a certificate for 200 shares, thus accounting for the 1,000 shares originally turned over to the syndicate by the petitioner. Respondent computed the profit derived by the petitioner from this transaction in accordance with article 58 of Regulations 74, which provides as follows:

When shares of stock in a corporation are sold from lots purchased at different dates and at different prices and the identity of the lots can not be determined, the stock sold shall be charged against the earliest purchases of such stock. The excess of the amount realized on the sale over the cost or other basis of the stock will constitute gain. * * *

The quoted regulation is commonly referred to as the " first in, first out " rule, and in appropriate cases has been approved both by the Board and the courts. The petitioner contends, however, that this rule should not be applied here, and that respondent erred in so computing the profit on the sale of his stock, for the reason that there is a sufficient identification to show that the 800 shares sold were the shares last acquired by him, and that the 200 shares returned in accordance with petitioner's oral request were those purchased in part in 1920 and in part received as a stock dividend.

We are unable to agree with the petitioner's contention. There is no evidence to show that the syndicate did not in fact sell or otherwise dispose of the 1,000 shares of stock delivered by the peti-

tioner, as it undoubtedly had a legal right to do. So far as the record discloses the syndicate may have sold petitioner's stock, and with the proceeds later have acquired the 800 shares which it sold in November 1928, the proceeds from which were remitted to the petitioner. Certainly it clearly appears that the syndicate sold 800 shares of the stock delivered to it by the petitioner and at least an additional 45 shares, since it was necessary for the syndicate to purchase that number of shares in order to return 200 shares to the petitioner. Furthermore, it is indicated that a new or different certificate for 200 shares was returned to the petitioner by the syndicate in lieu of the original certificate or certificates covering a like number of shares turned over by petitioner to the syndicate.

In the light of these facts, there having been no identification of any of the shares in question, we are unable to find that the syndicate sold the 800 shares of stock last acquired by the petitioner, and returned to him the 200 shares first acquired. The petitioner has not discharged the burden of proof upon him to show that respondent's determination on this point is erroneous.

The petitioner relies upon *Howbert* v. *Penrose*, 38 Fed. (2d) 577, to support his contention. The decision cited is distinguishable on the facts from the present proceeding. In that case the trial court found on the evidence of Penrose that he intended to and *did in fact sell* certain blocks of stock which represented his latest purchases. As pointed out above, there is no evidence in the instant case to show that the entire 1,000 shares of stock delivered by the petitioner to the syndicate were not sold and other shares purchased, nor that other repurchases and resales were not made prior to November 1928. If it was the petitioner's intention not to sell but to retain the 200 shares first acquired by him, the evidence we think clearly shows that such intention was not carried out by the syndicate.

In *Snyder* v. *Commissioner*, 54 Fed. (2d) 57; affirming 20 B.T.A. 778, the court said:

Where shares " are sold from lots purchased at different dates and at different prices " in a marginal account it is clear that, in the absence of something else, the identity of the lots sold could not be determined, hence the cited regulation, which is tersely called the " First in, first out " rule. The rule is an arbitrary one, as from the very nature of the case it must be; yet, again from the nature of the case, it is reasonable.

See also *David Stewart*, 17 B.T.A. 604, and cases cited; *Western Bank & Trust Co.*, 19 B.T.A. 401, 412; *John A. Snyder*, 20 B.T.A. 778; affd., 54 Fed. (2d) 57, *supra*.

Respondent's action on the third issue is approved.

Reviewed by the Board.

*Judgment will be entered for the respondent.*

BLACK and ADAMS concur in the result.