JAMES A. MESSER COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4130–69.    Filed March 23, 1972.

*Dennison L. Mitchell* and *Wallace E. Whitmore*, for the petitioner. *Thomas C. Morrison*, for the respondent.

FORRESTER, *Judge*: Respondent has determined deficiencies in petitioner's Federal income tax of $4,295.70 and $42,428.40 for the taxable years 1964 and 1965, respectively. The issues presented for our decision concern petitioner's entitlement to deductions under section 166 [1] for additions to its bad debt reserve.

FINDINGS OF FACT

*General*

Some of the facts were stipulated and are so found. The two stipulations of facts and the exhibits attached thereto are incorporated herein by this reference.

---

[1] All statutory references are to the Internal Revenue Code of 1954, unless otherwise specified.

For the years 1964 and 1965 petitioner filed its Federal income tax returns on a calendar year basis with the district director of internal revenue in Baltimore, Md. On the date of the filing of the petition herein, petitioner maintained its principal office in Washington, D.C.

Petitioner James A. Messer Co. was incorporated under the laws of Washington, D.C., and has operated under its present name as a wholesale plumbing supply business since 1919. Roderick D. Watson and some associates purchased control of petitioner in 1940. From January 1948 until his death in January 1959, Watson owned a substantial majority of petitioner's outstanding stock and was its president. After the death of Watson his stock in petitioner was held in his estate until June 1963, at which time a majority of petitioner's stock devolved upon his widow, Angela R. Watson, who held the stock throughout the years in issue. Petitioner's principal assets were disposed of in 1969, and it has been in the process of liquidation since that time.

### Issue 1. The Watson Co. Debt

· Petitioner's business was severely damaged in the 1940's by the lack of a reliable source of cast-iron soil pipe, a very important item in petitioner's business, which was in short supply at that time. The foundry from which petitioner had been purchasing its soil pipe had gone out of business; and the other foundries in the Washington, D.C., area were selling their soil pipe production primarily to their established customers, leaving petitioner without an adequate supply.

In response to the soil pipe shortage petitioner's shareholders incorporated Watson Co. under the laws of Maryland in August 1948. Watson Co. filed its Federal income tax returns on the basis of a year ending July 31. At all times material hereto Watson or his estate owned a majority of the stock in Watson Co.

Watson Co. erected a foundry on land it purchased in Bowie, Md., and began the production of soil pipe in late 1948. Petitioner satisfied its need for soil pipe by purchasing one-third to one-half of Watson Co.'s production at the prevailing market price. The value to petitioner's business of a steady supply of soil pipe was sufficient to justify the advancement by petitioner to Watson Co. of substantial sums of money, both at the time of the latter's incorporation and thereafter. Respondent has offered no objection to the characterization of these advances as valid debts, and we will hereinafter refer to them collectively as the Watson Co. debt.

By 1956 the shortage of soil pipe on the market had been transformed into a surplus and the market price had decreased substan-

tially. Watson Co. had accumulated a large oversupply of soil pipe, and it found that it could no longer manufacture the pipe profitably. Watson Co. closed its foundry in December 1956, with a view toward reopening it if the inventory was sold and market conditions improved. It kept up the grounds and maintained a 24-hour guard on the premises until sometime in 1959.

On January 30, 1959, soon after the death of Roderick D. Watson, Watson Co.'s board of directors decided to permanently shut down the foundry, and to commence the liquidation of Watson Co. Watson Co.'s assets, other than its land and building in Bowie, Md., were all disposed of by June 1961, with the exception of some materials which were sold for $230.50 in 1965.

In March 1959 Watson Co. agreed to sell the land and building in Bowie, Md., for $27,500. However, before the transaction was closed Watson Co.'s officers learned that without their knowledge the property had been rezoned to "rural residential," and this change in circumstances caused the buyer to cancel the sale. Real estate experts advised the managements of petitioner and Watson Co. that the property had limited value if restricted to residential usage. The officers of the two companies then decided that Watson Co. should hold the land and building until a change in zoning could be obtained.

In late 1964 or early 1965 thieves entered upon Watson Co.'s property, dismantled the building and its fixtures, and carried them away. A railroad siding and a 3-ton furnace standing 65 feet tall were the only articles other than debris left on the land after the theft. The combined book value of the building and fixtures had been $13,217.12 on July 31, 1964.

The land, approximately 2 acres, was transferred to petitioner in September 1965 in partial satisfaction of the Watson Co. debt. The land's value had been appraised at $17,000 in July 1965, a value substantially lower than would have obtained if the efforts to achieve more favorable zoning had been successful. After the transfer of the land to petitioner, Watson Co. possessed no assets of any value and was dissolved soon thereafter. In 1967 petitioner had the land independently appraised and learned that its market value would be approximately $45,000 if it were zoned for industrial uses. Petitioner still held the land at the time of trial herein, May 1971, at which time the zoning remained rural residential.

Except for a nominal amount of accrued expenses, Watson Co.'s sole liability from and after July 31, 1957, was the debt it owed to

petitioner. The following table provides a partial history of the Watson Co. debt, and also chronicles petitioner's net operating loss experience:

| Year ended Dec. 31— | Balance of Watson Co. account [1] | Petitioner's taxable income before deduction of net operating loss carryover | Balance of unused net operating loss to be carried forward |
|---|---|---|---|
| 1948 | $93,980.32 | ([2]) | ([2]) |
| 1949 | 128,473.11 | ([2]) | ([2]) |
| 1950 | 192,757.29 | ([2]) | ([2]) |
| 1951 | 228,152.89 | ([2]) | ([2]) |
| 1952 | 196,196.12 | ([2]) | ([2]) |
| 1953 | 199,781.23 | ($39,013.89) | [3]0 |
| 1954 | 199,923.07 | (23,623.02) | [3]0 |
| 1955 | 187,303.65 | 18,595.27 | [3]0 |
| 1956 | 207,227.82 | (29,268.04) | $10,672.77 |
| 1957 | 189,937.54 | (88,371.74) | 99,044.51 |
| 1958 | 199,960.68 | (102,275.36) | 201,319.87 |
| 1959 | 187,989.12 | (31,555.49) | 232,875.36 |
| 1960 | 186,989.12 | (883.73) | 233,759.09 |
| 1961 | 185,949.12 | 6,548.93 | [4]223,086.32 |
| 1962 | 185,949.12 | 38,372.96 | [5]134,714.58 |
| 1963 | 186,299.12 | 82,585.36 | [6]32,494.22 |
| 1964 | 186,299.12 | 37,518.83 | 0 |
| 1965 | [7]168,939.28 | (76,877.29) | 76,877.29 |

[1] This balance consists of the sum of petitioner's advances to Watson Co. less petitioner's soil pipe purchases from Watson Co.
[2] Not available.
[3] The entire net operating losses for these 2 years appear to have been carried back and deducted from taxable income in the years 1951 and 1952. See sec. 172(b)(1)(A)(i).
[4] The unused portion of the 1956 net operating loss deduction ($4,123.84) is not included in this figure because it cannot be carried forward more than 5 years. See sec. 172(b)(1)(B).
[5] This figure does not include the unused portion of the 1957 net operating loss deduction ($49,998.78). See fn. 4.
[6] This figure does not include the unused portion of the 1958 net operating loss deduction ($19,690). See fn. 4.
[7] The evidence is inconsistent with regard to this figure. However, the discrepancy is only $119.50, and the weight of the evidence is clearly in favor of the figure we have included above.

After 1958 Watson Co. made the following payments on its debt to petitioner:

| | |
|---|---|
| Net cash payments and sales to petitioner in 1959 | $11,971.59 |
| Cash payment 8/5/60 | 1,000.00 |
| Cash payment 4/21/61 | 1,040.00 |
| Cash advanced by petitioner to Watson Co. 9/3/63 | (350.00) |
| Cash payment 7/27/65 | 230.50 |
| Land transferred to petitioner at appraised value 9/23/65 | 17,000.00 |
| | 30,892.09 |

After December 31, 1958, petitioner's books treated $185,000 of the Watson Co. debt as a note receivable. Petitioner reflected the remainder of the debt in its accounts receivable and accounts payable.

The following table provides a brief financial history of Watson Co.:

| Year ended July 31— | Net income before net operating loss carryover | Taxable income | Total assets | Total liabilities | Equity |
|---|---|---|---|---|---|
| 1949 | ($27,248.83) | 0 | $149,063.77 | $170,338.68 | ($21,274.91) |
| 1950 | (44,882.57) | 0 | 149,109.31 | 215,088.11 | (65,978.80) |
| 1951 | 27,199.16 | 0 | 186,789.38 | 225,407.47 | (38,618.09) |
| 1952 | (46,862.39) | 0 | 158,361.10 | 243,766.93 | (85,405.83) |
| 1953 | (2,644.06) | 0 | 148,711.89 | 236,010.16 | (87,298.27) |
| 1954 | (3,229.29) | 0 | 164,432.77 | 255,136.69 | (90,703.92) |
| 1955 | 16,597.45 | 0 | 177,155.29 | 251,482.13 | (74,326.84) |
| 1956 | 7,190.55 | 0 | 187,279.24 | 254,439.12 | (67,159.88) |
| 1957 | (43,420.33) | 0 | 91,683.96 | 202,417.80 | (110,733.84) |
| 1958 | (25,902.86) | 0 | 71,942.44 | 208,507.21 | (136,564.77) |
| 1959 | (5,373.54) | 0 | 48,900.19 | 191,726.90 | (142,826.71) |
| 1960 | (4,346.37) | 0 | 41,406.38 | 188,579.46 | (147,173.08) |
| 1961 | (4,109.90) | 0 | 34,666.14 | 185,949.12 | (151,282.98) |
| 1962 | (4,641.43) | 0 | 30,024.71 | 185,949.12 | (155,924.41) |
| 1963 | (4,392.19) | 0 | 25,632.52 | 185,949.12 | (160,316.60) |
| 1964 | (4,472.08) | 0 | 21,510.44 | 186,299.12 | (164,788.68) |
| 1965 | (12,996.50) | 0 | [1] 8,283.44 | 186,068.62 | (177,785.18) |
| 1966 | [2] 8,716.56 | 0 | 0 | 169,068.62 | (169,068.62) |

[1] This figure represents the book value of the land in Bowie, Md., on which Watson Co.'s foundry had been located.
[2] This is the amount of the capital gain which resulted when the land was transferred to petitioner in September 1965, in partial satisfaction of Watson Co.'s debt. The land had been appraised at $17,000 in July 1965.

The following is an excerpt from the minutes of the January 30, 1959, meeting of the shareholders of Watson Co., and is an accurate and true statement of the factors leading to the adoption of the resolution to liquidate Watson Co.:

There was some discussion of the affairs of the Company and it was the concensus [sic] of opinion that during last year it had become evident to all concerned that it would not be possible, nor profitable if possible, to reopen the plant and that the liabilities of the Company were of such magnitude that there was no hope of any monies being available to the stockholders in a liquidation. The only alternatives seemed to be the filing of a petition of bankruptcy or a voluntary liquidation of the assets of the Company and the disbursement of the funds received to pay expenses and the balance to be applied on the liabilities. Since a bankruptcy would involve the payment of certain fees and legal expenses, it was suggested that a simple liquidation of assets would probably be the best course. Mr. Marlin offered the following resolution:

RESOLVED, That the Board of Directors be instructed to proceed with the liquidation of the assets of the Company and the disbursement of the proceeds on the expenses and liabilities, And further, that the Board of Directors also be instructed and authorized to take whatever action is needed and to follow the procedures that in their judgment will result in the disposition of the assets at the earliest date possible consistent with receiving a reasonable price therefor.

On motion, seconded and unanimously carried, the motion was adopted.

For the taxable year ended December 31, 1957, an independent firm of certified public accountants audited petitioner's books and insisted on revising the method used to account for the Watson Co. debt. The accountants set up a provision for possible loss account in the amount of $109,837.54, which reduced the net amount of the debt reflected on

petitioner's audited balance sheet of December 31, 1957, to $80,000. The accountants explained their adjustment as follows:

We understand that the Watson Company has closed down operations. It appears extremely doubtful if the Messer Company will receive full payment for the amount owing by the Watson Company. Therefore, a provision for possible loss in the amount of $109,837.54 has been made which reduces this account to the approximate book value (exclusive of the amount owing to the Messer Company) of that Company which was approximately $80,000.00 as shown by a balance sheet of the Watson Company at July 31, 1957 which is the latest balance sheet available. Book value has been used in the absence of any other basis for valuing this receivable and it does not, of course, necessarily represent the ultimate amount to be received from the Watson Company.

It is, of course, possible that the Watson Company may resume operations in which case the Messer Company might collect considerably more on this account than the $80,000.00 shown in this report, or if the assets of the Watson Company, including plant and equipment, are sold it is also possible that the sales price may exceed the book value of these assets in which event the Messer Company should recover more than $80,000.00 for this account. However, in view of the fact that the Watson Company has for the present ceased operations, we believe that some provision for a possible loss on this account should be made and have accordingly reduced this receivable to the approximate book value of the Watson Company. We want to emphasize that book value has been used only in the absence of any other basis for valuing the account and obviously the ultimate amount to be received on this account may be more or less than the book value of $80,000.00.

The reaction of petitioner's shareholders to this adjustment is depicted in the following excerpt from the minutes of their annual meeting of June 2, 1958:

Mr. Watson presented the report of the Company's auditors for the year ended December 31, 1957. After some discussion of the statements included therein, it was moved, seconded, and unanimously carried that the Balance Sheet and Statement of Profit and Loss be made a part of these minutes with the notation to be made in the minutes that we do not agree with the Provision for Possible Loss of $109,837.54 set up by the auditors on the Balance Sheet and Statement of Profit and Loss and that no such adjustment was made on the books of the Company.

For the taxable year ended December 31, 1958, the same accounting firm made a further addition to the provision for loss account. This addition reduced the net value of the Watson Co. debt reflected on petitioner's audited balance sheet to a nominal $1. The accountants made the following comment:

As the controlling stockholder of the Watson Company died in January 1959 and the Company is not operating, the amount that will be recovered by the Messer Company cannot be reasonably determined at this time. Therefore, the Board of Trustees of the Messer Company authorized a provision for possible loss on this asset in the amount of $199,959.68 reducing this asset to the nominal value of $1.00.

In early 1959, shortly after the death of Roderick D. Watson, petitioner's board of trustees decided to follow the lead of the accountants and reduce the book value of the Watson Co. debt reflected in petitioner's journal as of December 31, 1958. The rationale and background for this decision is revealed in the following passage from the minutes of the March 9, 1959, special meeting of petitioner's board of directors:

Mr. Marlin then commented that there had been some confusion the previous year with persons reading the financial statements and inferring that the value stated on the Balance Sheet was the value of the account to the Company. In order to avoid such confusion in the future, it would be best to write the account down to a nominal valuation until such time as the amount of recovery could be determined. He then offered the following resolution:

"RESOLVED, That, inasmuch as there is a large amount shown on the books of the Company as due from The Watson Company and that while the account is not considered worthless, the probable recovery thereon is not determinable by any means known to the Board of Trustees, a nominal value of $1.00 be placed on this claim as of December 31, 1958.

AND FURTHER RESOLVED, That as any valuation other than a nominal value, would imply an estimated recovery of that valuation to persons not intimately familiar with the matter, the Company will reduce the claim to said nominal value of $1.00 on its books, by setting up a sufficient "Provision for Possible Loss" and immediately charging all but $1.00 of the amount due from The Watson Company to the "Provision for Possible Loss". All statements of the Company's financial position at December 31, 1958, will show the amount due from The Watson Company at the nominal value of $1.00 and the Board of Trustees agrees that this is their sole responsibility and that the Company's auditors, Councilor, Buchanan, Mitchell and Hayes are relieved of any responsibility for placing a value on this asset.

AND FURTHER RESOLVED, That while the probable recovery is not determinable at this time, neither is it determinable that the account is worthless. Therefore, no deduction for this item will be taken on the income tax returns of the Company until such time as the amount of the loss is fixed."

After some discussion, Mr. Stecher moved that the resolution be adopted. The motion was seconded and upon vote was unanimously adopted.

Petitioner in fact waited until the taxable year 1965 to take a bad debt deduction for the unpaid balance of the Watson Co. debt. Petitioner's Federal income tax return for 1965 included the following explanation of its bad debt deduction for that year:

The bad debts deduction of $179,423.35 includes a bad debt of $168,939.28 owing by a corporation which formerly owned and operated a soil pipe foundry in Bowie, Maryland. This foundry was established in 1948 and produced only soil pipe which at that time was in very short supply. The Messer Company, which is a wholesale distributor of plumbing supplies, was its principal customer as this foundry was its only source of soil pipe. Over the years, the Messer Company advanced the foundry substantial sums of money in excess of its purchases in order to keep the foundry operating as it was in financial difficulties from time to time.

The foundry finally became insolvent and discontinued business. Its machinery, patterns, etc. were sold and the proceeds were remitted to the Messer Company in part payment of advances made to the foundry. The only remaining asset of the foundry was approximately two acres of land in Bowie, Maryland. During the year 1965, the Messer Company took title to this land at its appraised value of $17,000.00 made by an independent appraiser. After applying this credit there remained an amount of $168,939.28 owing to the Messer Company which became completely worthless in 1965 as the foundry corporation had no assets of any kind or description.

Respondent disallowed a deduction for an addition to petitioner's bad debt reserve in 1965 to reflect the writeoff of the Watson Co. debt, claiming that the debt did not become worthless in 1965. Respondent also ignored the Watson Co. account in computing a reasonable bad debt reserve for 1965.

In 1957 W. Earl Marlin, secretary and chief financial officer of petitioner, claimed that his stock in Watson Co. was worthless and took a loss deduction with respect thereto on his Federal individual income tax return.

Marlin, as a coexecutor of the estate of Roderick D. Watson, prepared the decedent's Federal individual income tax return for 1958 and claimed thereon a loss deduction in respect of the decedent's purportedly worthless stock in Watson Co. Marlin prepared the return in 1959 after the Messer Co. board of directors had decided to liquidate Watson Co., and it had become apparent that all of Watson Co.'s assets would be subject to the prior claims of its creditors. The Federal estate tax return filed in April 1960 for the estate of Roderick D. Watson listed the decedent's stock in Watson Co. at a value of zero. Marlin was partially responsible for the decision to reflect this zero value. The internal revenue agent examining the estate tax did not challenge the zero valuation of the Watson Co. stock.

In the late 1950's a new manufacturing process called centrifugal casting became prevalent in the cast-iron soil pipe industry. The centrifugal casting process was clearly superior to the existing static hand-casting process which was used in Watson Co.'s foundry. Watson Co. would have needed to make a heavy capital investment to change to the centrifugal casting process. The widening popularity of this new process was not a major factor in Watson Co.'s decision to close its foundry in 1956, but did figure significantly in the early 1959 decision not to reopen the foundry. The southern and east coast soil type foundries converted to the centrifugal casting process beginning approximately in 1954, and had largely converted by 1960. The advent and acceptance of this new process rendered much of Watson Co.'s foundry equipment obsolete, adversely affecting its resale value. Most of petitioner's molds, patterns, and other equipment were in fact eventually sold for scrap.

The U.S. Department of Commerce compiled the following chart from data gathered by the Bureau of the Census. The chart depicts the production of cast-iron soil pipe and fittings from 1950 through 1959:

| Year | Number of plants | Short tons | Year | Number of plants | Short tons |
|---|---|---|---|---|---|
| 1950 | (¹) | 794, 633 | 1955 | 52 | 869, 515 |
| 1951 | (¹) | 687, 503 | 1956 | 47 | 817, 762 |
| 1952 | (¹) | 651, 472 | 1957 | 45 | 758, 308 |
| 1953 | 56 | 677, 166 | 1958 | 40 | 788, 659 |
| 1954 | 52 | 743, 711 | 1959 ² | 38 | 865, 000 |

¹ Not available.
² Last 4 months estimated.

The substantial decrease in the number of plants producing cast-iron soil pipe was due largely to the industry's changeover to the centrifugal casting process. Despite the sharp decline in the number of producing plants after 1953 the capacity of the industry was not reduced.

*Issue 2. Reasonableness of Bad Debt Reserve*

Petitioner's business declined in the last few years before Watson's death in January 1959. Soon after his death the new management initiated a policy of seeking to enhance petitioner's sales through the extension of credit to new firms without established credit ratings.

The following chart reveals relevant information respecting petitioner's bad debt experience from 1953 through the close of 1969:

| Year ended Dec. 31— | Gross amount added to bad debt reserve ¹ | Amount charged against the bad debt reserve ² | Balance remaining in the bad debt reserve | Accounts and notes receivable (minus Watson Co. debt) | Total sales | Credit sales |
|---|---|---|---|---|---|---|
| 1953 | $4, 411. 23 | $1, 163. 58 | $24, 048. 99 | $296, 162. 52 | $2, 712, 027. 61 | (³) |
| 1954 | 8, 474. 79 | 2, 382. 60 | 30, 141. 18 | 297, 476. 38 | 2, 555, 392. 43 | (³) |
| 1955 | 8, 821. 00 | 910. 21 | 38, 051. 97 | 392, 207. 27 | 2, 657, 321. 00 | (³) |
| 1956 | 8, 511. 38 | 42. 06 | ⁴ 46, 521. 49 | 387, 963. 90 | 2, 410, 544. 19 | (³) |
| 1957 | 5, 419. 04 | 15, 728. 50 | ⁴ 36, 212. 30 | 324, 960. 93 | 1, 781, 418. 41 | (³) |
| 1958 | 12, 051. 02 | 16, 309. 92 | 31, 953. 13 | 310, 793. 64 | 1, 675, 524. 05 | (³) |
| 1959 | 8, 203. 39 | 18, 314. 62 | 21, 841. 90 | 369, 590. 77 | 2, 271, 448. 63 | $2, 206, 184. 13 |
| 1960 | 18, 771. 48 | 6, 557. 45 | 34, 055. 93 | 474, 377. 28 | 2, 202, 042. 36 | 2, 115, 726. 53 |
| 1961 | 40, 008. 05 | 3, 656. 04 | 70, 407. 94 | 486, 620. 08 | 2, 272, 933. 61 | 2, 187, 364. 82 |
| 1962 | 26, 526. 09 | 18, 598. 56 | 78, 335. 47 | 473, 084. 85 | 2, 740, 806. 14 | 2, 674, 346. 36 |
| 1963 | 8, 943. 65 | 6, 428. 97 | 80, 850. 15 | 394, 056. 32 | 3, 063, 038. 53 | 2, 981, 218. 25 |
| 1964 | 19, 525. 90 | 4, 596. 12 | 95, 779. 93 | 427, 965. 86 | 3, 184, 297. 11 | 3, 112, 718. 69 |
| 1965 | ⁵ 179, 423. 35 | ⁵ 172, 092. 68 | 103, 110. 60 | 472, 578. 48 | 3, 298, 047. 53 | 3, 187, 614. 60 |
| 1966 | 15, 156. 00 | 39, 979. 00 | ⁶ 78, 288. 00 | 352, 085. 00 | 2, 913, 157. 00 | 2, 791, 640. 00 |
| 1967 | 16, 488. 00 | 6, 929. 00 | ⁴ 87, 848. 00 | 396, 718. 00 | 3, 057, 391. 00 | 3, 028, 204. 00 |
| 1968 | 11, 505. 00 | 67, 596. 00 | 31, 756. 00 | 431, 689. 00 | 3, 415, 933. 00 | 3, 403, 223. 00 |
| 1969 | ⁷ (11, 182. 00) | (12, 782. 00) | ⁴ 33, 358. 00 | 85, 894. 00 | 2, 160, 319. 00 | 2, 127, 286. 00 |

¹ This figure also, of course, represents the bad debt deduction taken by petitioner for the year.
² The figures in this column are the net amounts of writtenoff accounts (those accounts determined by petitioner to be worthless) less recovered accounts (those accounts paid which were previously written off).
³ Not available.
⁴ Minor arithmetic errors appear to have been committed in the computation of these stipulated figures.
⁵ These two figures include the amount of the Watson Co. debt ($168,939.28), which was written off and deducted in 1965.
⁶ This figure was rounded to the nearest dollar in the relevant stipulated exhibit, whereas the figures for prior years were not rounded.
⁷ In 1969 petitioner judged its bad debt reserve to be excessive and reduced it by $16,064.57. Of this figure, $11,182 represented amounts which had been taken as bad debt deductions in prior years and which were thus taken back into income for taxable year 1969. The remaining $4,884 represented a reversal of the estimated bad debt expense for 1969 which had not yet been deducted for Federal income tax purposes.

Petitioner computed an addition to its bad debt reserve each year by evaluating all of its outstanding accounts receivable. Petitioner's management, together with its certified public accountants, prepared an aging schedule which divided its accounts receivable into current, over 30 days, over 60 days, and over 90 days overdue. The necessary bad debt reserve was then estimated on the basis of this information and the financial condition of the debtor on each overdue account. At the close of the years 1964 and 1965, petitioner had accounts receivable 90 days or more overdue totaling $113,491.06 and $100,127.26, respectively.

Respondent determined that petitioner's bad debt reserve was excessive at the close of both 1964 and 1965, claiming that a reasonable reserve should have amounted to no more than $10,361.19 and $10,351.72, respectively. Since petitioner's reserve would have stood at $73,100.63 at the close of 1965 without the claimed additions for 1964 and 1965, respondent disallowed deductions for either addition.

In his computations respondent adhered strictly to the formula approved by this Court in *Black Motor Co.* v. *Commissioner*, 41 B.T.A. 300 (1940), affd. 125 F. 2d 977 (C.A. 6, 1942). Respondent's analysis and conclusions are embodied in the following two charts:

JAMES A. MESSER CO.

Schedule of Reserve for Bad Debts, 1964

| Year | Outstanding customer accounts receivable | Bad debt losses [1] | Bad debt recoveries [1] |
|---|---|---|---|
| 1959 | $369,590.77 | $18,314.62 | 0 |
| 1960 | 474,377.28 | 6,557.45 | $16.37 |
| 1961 | 486,620.08 | 3,656.04 | 0 |
| 1962 | 473,084.85 | 18,598.56 | 56.00 |
| 1963 | 394,056.32 | 6,428.97 | .70 |
| 5-year total | 2,197,729.30 | 53,555.64 | 73.07 |
| Average | 439,545.86 | 10,711.13 | 14.61 |
| 1964 | 426,386.61 | 4,598.12 | |
| Average bad debt losses ($10,711.13—$14.61) | | | $10,696.52 |
| Average losses to average receivables ($10,696.52÷$439,-545.86) percent | | | 2.43 |
| Reasonable bad debt reserve at 12/31/64 ($426,386.61×2.43%) | | | $10,361.19 |
| Reserve for bad debts at 12/31/64 per 1964 return | | | $95,779.93 |
| Excessive bad debt reserve at 12/31/64 | | | $85,418.74 |
| Addition to reserve per 1964 return—disallowed | | | $19,525.90 |

[1] The figures given in these two tables under the heading "Bad debt losses" have already been reduced by the corresponding amounts under the heading "Bad debt recoveries." At trial respondent's agent conceded that he erred when he again subtracted out average bad debt recoveries to arrive at average bad debt losses. However, this error was not large enough to alter the percentages eventually derived.

Note: Outstanding customer accounts receivable represents accounts receivable per Schedule F, Form 1120, less accounts receivable from Watson Co.

| Year | Outstanding customer accounts receivable | Bad debt losses [1] | Bad debt recoveries [1] | |
|---|---|---|---|---|
| 1959 | $369,590.77 | $18,314.62 | 0 | |
| 1960 | 474,377.28 | 6,557.45 | $16.37 | |
| 1961 | 486,620.08 | 3,656.04 | 0 | |
| 1962 | 473,084.85 | 18,598.56 | 56.00 | |
| 1963 | 394,056.32 | 6,428.97 | .70 | |
| 1964 | [2] 426,386.61 | 4,596.12 | 93.94 | |
| 6-year total | 2,624,115.91 | 58,151.76 | 167.01 | |
| Average | 437,352.65 | 9,691.96 | 27.84 | |
| 1965 | 468,403.51 | 3,153.40 | 836.87 | |
| Average bad debt losses ($9,691.96−$27.84) | | | 9,664.12 | |
| Average losses to average receivables ($9,664.12÷$437,352.65), percent | | | 2.21 | |
| Reasonable bad debt reserve at 12/31/65 ($468,403.51×2.21%) | | | | $10,351.72 |
| Bad debt reserve per return at 12/31/65 | | | $103,110.60 | |
| Less: Addition to reserve in 1964 | | | 19,525.90 | |
| | | | $83,584.70 | |
| Add: Amount charged to reserve on return which was written off books in prior years | | | $168,939.28 | |
| | | | | 252,523.98 |
| Excessive bad debt reserve at 12/31/65 | | | | 242,172.26 |
| Addition to reserve per 1965 return— disallowed | | | | 179,423.35 |

[2] Our examination of the stipulated exhibits has revealed that this figure should be $427,955.86. However, this change does not produce a significant alteration in the subsequent calculations, and we accept respondent's results.

In making his calculations respondent did not consider any of the following factors: The change in petitioner's credit policy which occurred in the early 1960's, petitioner's total credit sales, the number of petitioner's accounts which were substantially overdue, or average industry experience with respect to bad debts.

#### OPINION

### *General*

For the taxable years 1964 and 1965 petitioner claimed deductions of $19,525.90 and $179,423.35, respectively. The entire 1964 deduction and $10,484.07 of the 1965 deduction represented additions to petitioner's reserve for bad debts arising from credit sales. The remaining $168,939.28 of the claimed 1965 deduction represented the separate writeoff of the net amount of the Watson Co. debt. Respondent disallowed petitioner's claimed deductions for 1964 and 1965 in their entirety.

Section 166 [2] permits taxpayers to either deduct bad debts in the year in which they become worthless, or to deduct reasonable additions to a reserve for bad debts. Petitioner in this case used the latter method (hereinafter referred to as the reserve method) to calculate an annual deduction for anticipated bad debts from its credit sales. However, the Watson Co. debt did not arise from credit sales and was not accounted for by prior additions to petitioner's bad debt reserve. Petitioner was thus entitled to deduct the net amount of the Watson Co. debt in the year in which it became worthless, as well as taking in that year a deduction for a reasonable addition to its reserve for bad debts arising from credit sales. *New York Water Service Corporation*, 12 T.C. 780, 788 (1949). Therefore, the following two distinct issues are presented for our decision: First, whether the Watson Co. debt ($168,939.28) became worthless and thus deductible in 1965, and, second, whether respondent abused his discretion in disallowing regular additions of $19,525.90 and $10,-484.07 to petitioner's bad debt reserve for 1964 and 1965, respectively.

## Issue 1. The Watson Co. Debt

Watson Co. was incorporated in 1948 by petitioner's shareholders in order to provide petitioner a reliable source of cast-iron soil pipe. Watson Co. manufactured soil pipe at its foundry in Bowie, Md., from 1948 until an oversupply of pipe at the foundry and low market prices precipitated the closing of the foundry in 1956. By 1959 the market price for soil pipe had not improved and the method of production used at Watson Co.'s foundry was fast becoming technologically obsolete. In early 1959 the shareholders of Watson Co. decided to liquidate the corporation, and nearly all of its equipment and inventory was sold by June 1961. The only assets of any substantial value remaining after June 1961 were the land, and the foundry building with its fixtures. The land was independently appraised at $17,000 in July 1965, and the building and fixtures had a depreciated book value

---

[2] SEC. 166. BAD DEBTS.

(a) GENERAL RULE.—

(1) WHOLLY WORTHLESS DEBTS.—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

(2) PARTIALLY WORTHLESS DEBTS.—When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction.

\* \* \* \* \* \* \*

(c) RESERVE FOR BAD DEBTS.—In lieu of any deduction under subsection (a), there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts.

of $13,217.12 on July 31, 1964. In late 1964 or early 1965 thieves dismantled and carried away the building and fixtures, and the land was transferred to petitioner in September 1965 in partial satisfaction of the Watson Co. debt. The net amount of the debt after offsetting against it the value of the land was $168,939.28, which amount was claimed as a bad debt deduction by petitioner for the taxable year 1965.

Section 166(a) essentially affords creditors two alternative methods of deducting business debts. Section 166(a)(1) permits a creditor to deduct the entire amount of a business debt in the year in which it becomes wholly worthless. Alternatively, if the respondent is satisfied that a business debt is recoverable only in part, he may allow a deduction for the debt to the extent it is written off on the taxpayer's books within the year. However, a creditor is not required to take a partial bad debt deduction even though it becomes certain within the year that the debt is partially worthless. He may instead wait until the debt becomes wholly worthless and deduct the full amount of the debt at that time. "A deduction for partial worthlessness of a debt need not be taken even though the extent of such partial worthlessness may be ascertained at a given time." *Los Angeles Shipbuilding & Drydock Corp.* v. *United States*, 289 F. 2d 222, 229 (C.A. 9, 1961); *E. Richard Meinig Co.*, 9 T.C. 976 (1947). Secured creditors have been allowed to wait until they have liquidated their security before taking a deduction for the unsecured portion of a bad debt. *Loewi* v. *Ryan*, 229 F.2d 627 (C.A. 2, 1956); *Old Colony Trust Associates* v. *Hassett*, 150 F.2d 179 (C.A. 1, 1945); *Kessler Oil & Gas Co.*, 41 B.T.A. 31 (1940). Although not technically secured, petitioner herein was in a position comparable to that of a secured creditor, because it was virtually the sole creditor of Watson Co. from and after July 31, 1957, and had a prior claim on all its assets. A taxpayer who fails to deduct a bad debt in the year in which it becomes wholly worthless loses the deduction. *Boehm* v. *Commissioner*, 326 U.S. 287 (1945); *Denver & Rio Grande Western Railroad Co.* v. *Commissioner*, 279 F. 2d 368, 374 (C.A. 10, 1960), affirming 32 T.C. 43 (1959).

Petitioner argues that the Watson Co. debt became wholly worthless in 1965 and was accordingly deductible in that year, irrespective of the fact that the debt was partially worthless prior to 1965. Respondent contends that the Watson Co. debt became wholly worthless prior to 1965, and that petitioner is therefore barred from deducting the amount of the debt in 1965.

Our determination of when the debt became worthless must stem from an objective[3] assessment of all the relevant facts and circumstances. Sec. 1.166–2(a), Income Tax Regs.; *Boehm* v. *Commissioner*, *supra*. Petitioner has the burden of proving that the debt actually became worthless in the year in which the deduction was claimed. *Boehm* v. *Commissioner*, *supra*.

A debt is ordinarily thought to become worthless in the year in which identifiable events clearly mark the futility of any hope of further recovery thereon. *Denver & Rio Grande Western Railroad Co.* v. *Commissioner*, *supra* at 375. In this case the identifiable events which fixed the Watson Co. debt as worthless were the dismantling and theft of the foundry building in late 1964 or early 1965, and the transfer of the land to petitioner in September 1965. Prior to these events the debt was only partially worthless, the extent of worthlessness fluctuating with the market value of the land and building. After these events it was patent that any efforts to recover the balance of the Watson Co. debt would be in vain. Petitioner appears to have correctly invoked the provisions of section 166(a), since a taxpayer may refuse the option of taking a partial bad debt deduction in favor of waiting to take a deduction when the debt becomes wholly worthless. *Los Angeles Shipbuilding & Drydock Corp.* v. *United States*, *supra*; *E. Richard Meinig Co.*, *supra*.

Respondent's position thus reduces to a claim that petitioner artificially ordered its affairs in respect of the Watson Co. debt solely with the aim of delaying the incidence of the bad debt deduction until it would produce the greatest tax benefits, and that therefore the debt must be deemed to have become worthless in a year prior to 1965. He relies in part on the following passage from *Avery* v. *Commissioner*, 22 F. 2d 6, 7–8 (C.A. 5, 1927):

A taxpayer should not be permitted to close his eyes to the obvious, and to carry accounts on his books as good when in fact they are worthless, and then deduct them in a year subsequent to the one in which he must be presumed to have ascertained their worthlessness. To do so would enable him to withhold deductions in his less prosperous years * * * and then to apply the accumulation at another time to the detriment of the fisc. This would defeat the intent and purpose of the law.

See also *Belser* v. *Commissioner*, 174 F. 2d 386 (C.A. 4, 1949); *Hirsch* v. *Commissioner*, 124 F. 2d 24, 30 (C.A. 9, 1941); *Hiram R. Lloyd*,

---

[3] Prior to the 1942 the test of worthlessness was subjective, relying heavily on the good-faith business judgment of the taxpayer. In 1942 Congress changed the law (retroactive to Jan. 1, 1939) to make the standard for determining worthlessness objective, stressing identifiable events and circumstances. H. Rept. No. 2333, 77th Cong., 2d Sess., pp. 44, 76 (1942); S. Rept. No. 1631, 77th Cong., 2d Sess., pp. 89–90 (1942); *Redman* v. *Commissioner*, 155 F. 2d 319 (C.A. 1, 1946), affirming a Memorandum Opinion of this Court.

34 B.T.A. 301 (1936); *Katherine H. Putnam*, 31 B.T.A. 241 (1934); *Henry C. Heinz*, 28 B.T.A. 276 (1933), affd. 70 F. 2d 461 (C.A. 5, 1934).

While it is true that petitioner had a history of failing to fully utilize its net operating loss carryover deductions within the 5-year time limit allowed for such deductions,[4] it does not necessarily follow that petitioner delayed the final liquidation of the Watson Co. debt until 1965 solely to insure that the resulting loss carryover would be fully consumed within the 5-year carryover period. Tax advantage is not to be equated with tax evasion, nor are taxpayers required to be oblivious to the tax consequences of their actions. Moreover, where a debtor has remained in possession of assets of substantial value which could yet be applied to the creditor's loan, the courts have granted the creditor considerable latitude in completing the liquidation of those assets before taking a bad debt deduction. This is understandable, given the need for unfettered business judgment to cope with the myriad considerations, legal and otherwise, which bear upon decisions respecting the liquidation of assets of an insolvent debtor. As Judge Learned Hand said in *Loewi* v. *Ryan*, 229 F. 2d 627, 629 (C.A. 2, 1956):

It is the creditor's privilege to decide when * * * [to sell property pledged, mortgaged, or otherwise transferred to secure a debt], and to cumber the privilege with such conditions as "good faith," "common-sense" or "economic reality" is to deny its full measure, quite aside from any uncertainty in the meaning of the words used.

See also *Industrial Trust Co.* v. *Commissioner*, *supra;* *Old Colony Trust Associate* v. *Hasset*, *supra;* and *Kessler Oil & Gas Co.*, *supra.* Watson Co. had assets of substantial value which were clearly to be applied to its debt with petitioner.

An exhaustive review of the record has convinced us that the events leading to the liquidation of those assets were not arranged by petitioner solely with a view toward producing the greatest tax benefits. A close analysis of respondent's arguments will bear out our conclusion.

Respondent first contends that Watson Co.'s liquidation was virtually completed in 1960, and that petitioner's delay until 1965 to actually culminate the liquidation was unwarranted. We disagree. Petitioner had attempted to sell the land and building in 1959, and would have consummated the sale but for the discovery of inappropriate zoning. The attempted sale is at least an indication that, at that point, petitioner wanted to dispose of the property and wind up the affairs of Watson Co. with dispatch. However, its inability to find a buyer willing to hazard the zoning problem prevented it from completing the liquidation of Watson Co's assets. Furthermore, substantial appre-

---

[4] See sec. 172(b) (1) (B).

ciation in the value of the foundry site would have attended a change in zoning. That fact also constituted good reason for petitioner to delay disposition of the site.

Respondent argues, however, that even if petitioner's failure to sell the land before 1965 was justified, it nevertheless held "constructive ownership" of the land and building prior to 1965, due to its creditor's rights in the property. However, the power to foreclose cannot be equated with actual foreclosure. We do not believe that petitioner was remiss in keeping the title to the land and building lodged in Watson Co. until 1965. Petitioner did not wish to own the foundry site; it wanted to sell it and apply the proceeds to the Watson Co. debt. It was thus entirely reasonable for petitioner to resist transferring the land to itself in order to avoid possible duplication of expense and paperwork when the title was again transferred to the eventual buyer. The belief of petitioner's management that the site could be rezoned and sold as industrial property was honest and sincere, judging from the testimony presented to us. In view of the delays which petitioner was likely to encounter in its efforts to secure industrial zoning, maintaining this belief until 1965 was not at all unreasonable. Petitioner's belief in the liquidity of the property appears to have waned in 1965, influencing its decision to transfer the land to itself in that year. Also, the theft of the building and its fixtures in late 1964 or early 1965 affected petitioner's decision to assume title to the land. It may well be that another creditor would have transferred the land and building to itself with greater celerity than did petitioner. However, the record convinces us that petitioner's actions were well within the scope of sound business judgment.

Respondent also points to the loss deductions taken on the Federal income tax returns of Marlin and Watson with respect to their stock in Watson Co. He further draws our attention to the zero valuation placed on Watson Co. stock in Watson's estate tax return. However, the value of Watson Co.'s stock is of only peripheral relevance, since stockholders of a company do not ordinarily share in its liquidation proceeds until all of its creditors are satisfied.

Respondent next focuses on the nominal value placed on the Watson Co. debt by petitioner's accountants in the years 1957 and 1958. However, this is another event of only marginal relevance, since the accountants explained in their notes that the nominal value was given to the Watson Co. debt because they were uncertain to what extent the debt was recoverable, not because it was worthless. This only demonstrates that the debt was partially worthless, not that it was wholly worthless. This analysis also applies to the action taken by

petitioner's board of directors in 1959 to reduce the book value of the Watson Co. debt to a nominal figure.

Respondent further notes that petitioner and Watson Co. were sibling corporations, and asserts that this common control was misused. However, on the record as a whole, we resolve this point in petitioner's favor.

## Issue 2. Reasonableness of Additions to Reserve for Bad Debts from Credit Sales

Petitioner used the reserve method of treating bad debts from its credit sales. It maintained a reserve account which was an estimate of the volume of its current accounts receivable which would become uncollectible. As the specific accounts actually became worthless they were charged against and reduced the balance in the bad debt reserve. The reserve was replenished by annual additions thereto. Such additions are deductible if they are "reasonable" within the meaning of section 166(c), and section 1.166–4, Income Tax Regs.[5] Section 1.166–4(b) of the regulations makes it clear that the reasonableness of an addition to the bad debt reserve depends largely on the reasonableness of the existing reserve. If the reserve balance is adequate to offset the bad debts reasonably to be anticipated from outstanding accounts, any further addition to the reserve will be deemed unreasonable and not deductible. *R. Gsell & Co.*, 34 T.C. 41, 56 (1960), reversed on other grounds 294 F. 2d 321 (C.A. 2, 1961).

In authorizing taxpayers to establish a reserve method of accounting for bad debts in lieu of deducting worthless debts as they materialize, section 166(c) expressly invests discretion in the respondent to review the reasonableness of the taxpayer's additions to the reserve. Thus, the presumed correctness of respondent's determination is reinforced by the statutory language, and petitioner must demonstrate

---

[5] Sec. 1.166–4. Reserve for bad debts.

(a) *Allowance of deduction.* A taxpayer who has established the reserve method of treating bad debts and has maintained proper reserve accounts for bad debts or who, in accordance with paragraph (b) of § 1.166–1, adopts the reserve method of treating bad debts may deduct from gross income a reasonable addition to a reserve for bad debts in lieu of deducting specific bad debt items.

(b) *Reasonableness of addition to reserve.*—(1) *Relevant factors.* What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.

(2) *Correction of errors in prior estimates.* In the event that subsequent realizations upon outstanding debts prove to be more or less than estimated at the time of the creation of the existing reserve, the amount of the excess or inadequacy in the existing reserve shall be reflected in the determination of the reasonable addition necessary in the current taxable year.

that respondent has abused his discretion in order to prevail. *Maverick-Clarke Litho Co.* v. *Commissioner*, 180 F. 2d 587 (C.A. 5, 1950), affirming 11 T.C. 1087 (1948) ; *Ehlen* v. *United States*, 323 F. 2d 535 (Ct. Cl. 1963) ; *R. Gsell & Co.*, supra; *C. P. Ford & Co.*, 28 B.T.A. 156 (1933).

At the beginning of 1964 petitioner's bad debt reserve stood at $80,850.15. During 1964 petitioner offset against the reserve $4,596.12 in actual bad debts, leaving a balance of $76,254.03 at yearend, which was 17.8 percent of the outstanding yearend accounts receivable. Petitioner made an addition of $19,525.90 to its bad debt reserve at the close of 1964, bringing it to $95,779.93, or approximately 22.4 percent of outstanding accounts receivable. Petitioner charged $3,153.40 against its bad debt reserve for the year 1965 (not including the Watson Co. debt), leaving at the close of the year a balance of $92,626.53, or 19.6 percent of yearend accounts receivable. An addition of $10,484.07 was made to the reserve for 1965 (not including the Watson Co. debt), which placed the balance in the reserve at $103,110.60, or approximately 21.8 percent of outstanding accounts receivable.

In reviewing petitioner's bad debt deductions for 1964 and 1965 respondent applied the method of analysis approved by this Court in *Black Motor Co.*, 41 B.T.A. 300 (1940), affd. 125 F. 2d 977 (C.A. 6, 1942). Respondent's computations revealed that for the 5 years prior to 1964 petitioner's actual bad debts averaged 2.43 percent of its yearend outstanding accounts receivable, and for the 6 years prior to 1965 its actual bad debts averaged 2.21 percent of its yearend accounts receivable. Respondent multiplied these percentages by petitioner's yearend outstanding accounts for 1964 and 1965, and arrived at "reasonable" bad debt reserves of $10,361.19 and $10,351.72, respectively. Since, even without the claimed additions, petitioner's bad debt reserve greatly exceeded what respondent considered to be reasonable, respondent disallowed the claimed additions for 1964 and 1965.

Petitioner contends that, especially in light of the events following 1965, respondent abused his discretion in disallowing its claimed bad debt deductions for the years in issue. Petitioner substantially depleted its reserve by charging against it in 1966 and 1968 actual bad debts totaling $39,979 and $67,596, respectively. Although section 1.166-4 (b) (1) of the regulations directs inquiry respecting the reasonableness of a bad debt reserve to the facts known at the close of the taxable year in question, hindsight from later years can sometimes be helpful and relevant. *Farmville Oil & Fertilizer Co.* v. *Commissioner*, 78 F. 2d 83 (C.A. 4, 1935), affirming 30 B.T.A. 1048 (1934) ; *Mill Factors Corporation*, 14 T.C. 1366 (1950) ; *Shield Co.*, 2 T.C. 763 (1943). Petitioner

also emphasizes that $113,491.06 and $100,127.26 of its accounts receivable were 90 days or more overdue at the close of 1964 and 1965, respectively; and petitioner notes that its claimed additions did not vary significantly from the nationwide average bad debt experience of firms comparable to itself. Petitioner also argues that, after its liquidation was commenced in 1969, it needed to reduce its reserve by only $11,182 to adjust for prior excesses. In sum, petitioner contends that respondent was unreasonable in excluding from his analysis consideration of any of these factors.

Had petitioner made neither the 1964 nor the 1965 addition to its reserve, the balance remaining in the reserve for 1966 would have been $73,100.63, or 15.5 percent of outstanding accounts receivable. Respondent did not abuse his discretion in determining that further additions to this reserve were unwarranted. Petitioner's evidence with respect to post-1965 events is not persuasive. We held in *Investors Discount Corp.*, 48 T.C. 767 (1967), that a bad debt reserve is essentially an annual estimate of the debts expected to become worthless in the following year. A balance of $73,100.63 in petitioner's reserve at the close of 1965 would have been more than ample to offset the $39,979 in actual bad debts suffered by petitioner in 1966. The evidence with respect to the bad debt experience of firms comparable to petitioner is not very helpful, because we are not told at what level their reserves stood prior to 1964 and 1965. Although petitioner points to its credit sales as a factor in calculating a reasonable reserve, it has not demonstrated that an analysis of its credit sales would justify the claimed additions. In sum, petitioner has not carried its burden of proving to our satisfaction that it needed a reserve in 1964 and 1965 in excess of 15.5 percent of its outstanding accounts receivable, when for the years from 1959 to 1964 its actual bad debts had amounted to only approximately 2.5 percent of its outstanding accounts.

*Decision will be entered under Rule 50.*