THOMAS PARSONS, JR., AND GENEVA O. PARSONS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Parsons v. Commissioner
Docket No. 12646-79.
United States Tax Court
T.C. Memo 1984-333; 1984 Tax Ct. Memo LEXIS 341; 48 T.C.M. (CCH) 401; T.C.M. (RIA) 840333; June 28, 1984. David R. Reeves, for the petitioners. Mark S. Feuer, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined the following Federal income tax deficiencies against petitioners: Year
Deficiency
1972
$1,335.48
1973
1,049.75
1974
386.13
Petitioners claim an overpayment of taxes for the year 1974 in the amount of $20,624. The *344 deficiencies for 1972 and 1973 result from respondent's tentative allowance of refunds in those years due to net operating loss carrybacks from 1975 and 1976. Petitioners' claim of overpayment of their 1974 Federal income tax results from respondent's ultimate disallowance of those net operating loss carrybacks to that year from 1975 and 1976. After concessions by both parties, the following issues are presented for our determination: (1) whether the statute of limitations, section 6501(a), [1] precludes respondent's assessment and collection of the deficiencies he has determined; (2) whether and, if so, to what extent petitioners' claimed business bad debt deductions in 1975 and 1976 are allowable; (3) whether deductions for depreciation claimed by petitioners in 1974, 1975, and 1976 from "business use" of their home are allowable; and (4) the fair market value of a 1974 Ford pickup truck received by petitioner Thomas Parsons, Jr., in 1975 as a dividend distribution. To facilitate disposition of these issues, we shall first make general findings of fact and then combine our findings and opinion with respect to each issue. *345 GENERAL FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Thomas Parsons, Jr. ("Mr. Parsons") and Geneva O. Parsons ("Mrs. Parsons"), resided in Hitchins, Kentucky at the time they filed their petition in this case. Petitioners are cash-basis taxpayers. Petitioners filed joint Federal income tax returns (Forms 1040) for the calendar years 1972 through 1976 on the cash basis. Pursuant to their requests for automatic extensions (Forms 4868), petitioners filed their 1975 and 1976 joint returns on June 15, 1976 and June 15, 1977, respectively. Petitioners' 1975 and 1976 returns reported net operating losses in the respective amounts of $10,347.32 and $71,754.00. On August 18, 1976, petitioners filed amended returns (Forms 1040X) for their years 1972 and 1973, claiming refunds. On the same day, petitioners filed an amended return (Form 1040X) for 1975 showing an increased net operating loss of $13,661, for a total loss of $24,008.32. Respondent allowed petitioners' claimed refunds for 1972 and 1973 in the respective amounts of $1,335.48 and *346 $1,213.75. On June 20, 1977, petitioners filed an amended return for their 1974 year claiming a refund of $19,146. In his statutory notice of deficiency to petitioners, issued May 31, 1979, respondent determined deficiencies for 1972 through 1974 and directed petitioners to set forth their claim for refund in any petition to this Court, which petitioners have done. I. Statute of Limitations
The deficiencies determined against petitioners for 1972 and 1973 are attributable to respondent's refund of taxes for those years from the carryback of petitioners' claimed 1975 and 1976 net operating loss. The statute of limitations for 1972 and 1973 is thus "the expiration of the period within which a deficiency for the taxable year of the net operating loss * * * which results in such carryback may be assessed." Sec. 6501(h). Petitioners' 1975 return was filed on June 15, 1976 and their 1976 return was filed on June 15, 1977. Accordingly, respondent's statutory notice, mailed to petitioners on May 31, 1979, was timely. Sec. 6501(a), (h). With respect to the 1974 deficiency, petitioners' *347 return was filed on or before April 15, 1975. The ordinary three-year period for assessment did not expire until April 15, 1978. Sec. 6501(a), (b)(1). On November 1, 1977, Mr. Parsons signed a Form 872 consenting to an extension of the period for assessment of petitioners' 1974 tax liability until December 31, 1978. Mrs. Parsons signed this Form 872 on November 2, 1977. Respondent's representative signed the form on November 8, 1977. On November 9, 1978, petitioners executed another Form 872, consenting to an extension of the assessment period for their 1974 liability until June 30, 1979. Respondent's representative signed that form on November 15, 1978. Respondent mailed his statutory notice of deficiency to petitioners on May 31, 1979, before the expiration of the limitations period as extended. Sec. 6501(c)(4). Petitioners dispute the effectiveness of the first Form 872 consent, claiming that they signed that form under duress. [2]Since there is a facially valid consent signed by petitioners and respondent, petitioners must affirmatively show that consent to be invalid. Crown Willamette Paper Co. v. McLaughlin,81 F. 2d 365 (9th Cir. 1936); *348 Concrete Engineering Co. v. Commissioner,19 B.T.A. 212 (1930), affd. 58 F. 2d 566 (8th Cir. 1932). [3] We have defined duress as "an act of one party [that] deprives another of his freedom of will to do or not to do a specific act . . . ." Diescher v. Commissioner,18 B.T.A. 353, 358 (1929). [4] A consent to extend the limitations periods executed under such circumstances is void. Diescher v. Commissioner,supra.[5] By no conceivable stretch of the imagination have petitioners shown that they acted under duress when they signed the first (November 1977) consent.
*349 Mr. Parsons testified--(1) that the revenue agent conducting his audit left the consent form with him, asking that both he and Mrs. Parsons execute it; (2) that he and Mrs. Parsons signed the consent form; (3) that the next morning, when he was to return the executed form to the revenue agent, he expressed reluctance to waive the limitations period; and (4) that the revenue agent threatened "to go down to the courthouse and get [a] jeopardy assessment" against petitioners if he did not give the agent the executed consent form. This is the extent of petitioners' "proof." First, we found Mr. Parsons' testimony to be vague, unresponsive, and generally unpersuasive. Second, the revenue agent, Clarence Estham, did not recall making such a "threat," and felt that he would recall such an event had it taken place. More importantly, the revenue agent specifically testified that under no circumstances would he threaten a taxpayer with a jeopardy assessment, that it was not within his authority to make such an assessment, and that if asked by a taxpayer what would happen if the taxpayer refused to sign a consent, he would have told him that a 30-day letter and a 90-day letter would be *350 issued. Finally, and most fatal to Mr. Parsons' scenario, is the time frame. Petitioners signed the consent form early in November of 1977, over five months before the normal three-year limitations period was due to expire. Despite this five-month gap, there is no testimony or other evidence that petitioners consulted with counsel or otherwise sought to avoid their execution of the consent forms and reclaim the benefits of the ordinary three-year limitations period. [6] Nor is there any explanation for their apparent failure to do so. Moreover, petitioners' voluntary execution of the second consent form belies the suggestion that they signed the first consent under duress. In short, we simply do not believe that Revenue Agent Estham threatened Mr. Parsons with a jeopardy assessment. *351 Furthermore, even if there had been such a threat, that alone would not support a finding of duress. There is simply no evidence that any such purported threat forced petitioners, against their will, to execute and deliver the consent form. Petitioners have completely failed to carry their burden of proof. Respondent's deficiency determinations are not barred by the statute of limitations. II. Bad Debts
The deficiencies determined by respondent for 1972 and 1973 and petitioners' claim of an overpayment for 1974 all arise from the net operating losses claimed by them in 1975 and 1976. These claimed net operating losses result from various deductions for business bad debts that petitioners have claimed and respondent has disallowed. During the entire period from 1972 through 1976, petitioners were not in the business of lending money. (a) Ken Hobbs Coal Company
In 1975, petitioners claimed a bad debt deduction of $7,125.50 on loans to the Ken Hobbs Coal Company. Ken Hobbs Coal Company was a joint venture based on an oral agreement Mr. Parsons had with Bob Hobbs ("Hobbs") and Ken Bryson ("Bryson") to broker coal. During 1975, Mr. Parsons issued checks to or *352 on behalf of Ken Hobbs Coal Company or Bob Hobbs totalling $6,000. Petitioners have not substantiated an expenditure in any greater amount. Respondent determined that the $6,000 was a nonbusiness bad debt allowable as a short-term capital loss. (b) P & Q
Late in 1974, Mr. Parsons and Roger Qualls ("Mr. Qualls") organized and incorporated Parsons and Qualls Mining Equipment and Sales Corporation, Inc. ("P & Q"). Mr. Parsons was a director, president, and 50 percent shareholder of P & Q. Petitioners claimed bad debt deductions on loans to P & Q in 1975 and 1976 in the respective amounts of $12,702.82 and $26,300. During 1974 and 1975, Mr. Parsons issued checks to or on behalf of P & Q totalling $13,105.44. Of this amount $2,500 was paid in 1974 and the remainder in 1975. In 1974, Mr. Parsons and Mr. Qualls jointly borrowed $40,000 from the Bank of the Mountains ("the Bank"), executing a negotiable promissory note. Mr. Parsons and Mr. Qualls used this $40,000 to operate P & Q's business. Since January of 1975, and up to the date of trial, $30,000 of this loan's principal amount remained unpaid. On December 10, 1974, P & Q borrowed $15,000 from the Bank. Mr. Parsons *353 and Mr. Qualls executed a negotiable promissory note for this debt in their capacities as officers of P & Q, and they both individually guaranteed the note. Since February 13, 1976, and up to the date of trial in this case, the unpaid principal balance of this loan was $12,622.15. On February 5, 1975, P & Q borrowed $10,000 from the Bank. Mr. Qualls executed a negotiable promissory note on behalf of P & Q and Mr. Parsons personally guaranteed P & Q's note. No payments of principal on this note were ever made; the entire $10,000 balance remained outstanding at the time this case was tried. In 1977, the Bank sued Mr. Parsons, both individually and as P & Q's president, as well as Mr. Qualls' estate and P & Q itself, to collect upon these three unpaid notes.At the time this case was tried, the Bank's suit against Mr. Parsons and the others was still pending. In 1976, another of P & Q's creditors sued petitioners, as well as Mr. Qualls' estate and widow and P & Q, upon another of P & Q's debts that petitioners has individually guaranteed. That suit sought recovery of $19,206.85. It also appears that Mr. Parsons and Mr. Qualls' estate were sued in 1976 for $10,979.09 by the Indiana *354 National Bank, yet another of P & Q's creditors, as guarantors of another of P & Q's debts. The record does not indicate the resolution of either of these two suits. Mr. Parsons computed petitioners' claimed deduction of $26,300 in 1976 for bad debts from P & Q simply as one-half of the unpaid balances due upon the three notes to the Bank of the Mountains. Petitioner's 1975 claimed deduction for bad debts from P & Q in the amount of $12,702.82 represents the bulk of the money Mr. Parsons paid to or on behalf of P & Q in 1974 and 1975. (c) Tri-State
Mr. Parsons was a 46.67 percent shareholder of Tri-State Flying Service, Inc. ("Tri-State"). During 1974 and 1975, Mr. Parsons issued checks to or on behalf of Tri-State totalling $4,000. On their 1975 return, petitioners claimed a deduction of $3,000 for bad debts from Tri-State. No notes or other evidence of debt were executed between petitioners and Tri-State. Tri-State was a subchapter S corporation and respondent allowed a loss of $13,661 in regard to Tri-State. Respondent adjusted Mr. Parsons' basis in his Tri-State stock by adding the $4,000 to basis and reducing the basis by the $13,661 loss. (d) Tom Parsons *355 Enterprises, Inc.
In 1975, petitioners and their son, Stanley L. Parsons, organized and incorporated Tom Parsons Enterprises, Inc. ("Enterprises"). In 1975 and 1976, petitioners made advances to or paid debts of Enterprises in amounts totalling $42,703.13. No notes or other evidence of debt were executed between petitioners and Enterprises, nor did Enterprises pay petitioners any amounts as interest. On their 1976 return, petitioners claimed a deduction for bad debts from Enterprises in the amount of $42,703. Section 166(a)(1) allows a deduction for debts that become worthless during the taxable year. There must be a bona fide debt, namely, one that "arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money." Sec. 1.166-1(c), Income Tax Regs. The taxpayer must reasonably expect that the money he advances will be repaid. Arrigoni v. Commissioner,73 T.C. 792, 799 (1980). Consequently, gifts and contributions to a corporation's capital are not bona fide debts. *356 Sec. 1.166-1(c), Income Tax Regs.; Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980). As a necessary corollary for cash basis taxpayers such as petitioners, there must be an actual outlay of cash or its equivalent before there is a debt; such outlay represents the taxpayers' basis. Sec. 166(b); Crown v. Commissioner,77 T.C. 582, 592-593 (1981). Moreover, the debt must become worthless during the year for which the deduction is claimed. Sec. 166(a)(1); Messer Co. v. Commissioner,57 T.C. 848, 861 (1972). Finally, for individual taxpayers such as petitioners, only business bad debts are deductible in full against ordinary income; nonbusiness bad debts are deductible only as short-term capital losses. Sec. 166(d). Petitioners bear the burden of proving all elements of deductibility. Rule 142(a). First, with respect to petitioners' guarantees of various P & Q debts, there was no bona fide debt owed to them by P & Q.A guarantor acquires by subrogation the debt owed by the principal only when he pays *357 the principal's obligation. Putnam v. Commissioner,352 U.S. 82, 85 (1956); Crown v. Commissioner,supra,77 T.C. at 597-598. [7] There is no evidence that petitioners have yet paid anything upon their guarantees. On the contrary, the evidence clearly shows that P & Q's debts have not been paid. Second, with respect to petitioners' other advances to or on behalf of their various business ventures (Ken Hobbs Coal Company, P & Q, Tri-State, and Tom Parsons Enterprises, Inc.), such advances were not bona fide debts. [8] Petitioners did not present notes or other documents evidencing debt, nor is there evidence of any payment of interest on any of these purported debts. There was no cogent evidence of the financial condition or capitalization of these ventures, so there is no way to determine whether or not they were adequately capitalized. Concerning petitioners' purported loans to P & Q, Mr. Parsons testified that he and Mr. Qualls expected repayment solely from P & Q's profits, if any. Repayment of such amounts was plainly dependent upon the success *358 of the corporate venture. From the meager record in this case, we believe the same conclusion is warranted regarding petitioners' other advances. Such amounts advanced to a business venture, whether incorporated or unincorporated, are contributions to capital, not loans. Sec. 1.166-1(c), Income Tax Regs.; Fin Hay Realty Co. v. United States,398 F. 2d 694 (3d Cir. 1968); Dixie Dairies Corp. v. Commissioner,supra,74 T.C. at 494-498. [9]
Finally, even assuming some of the advances were loans, petitioners have offered no evidence of "identifiable" events constituting reasonable grounds for concluding that recovery of any such debt was hopeless. Messer Co. v. Commissioner,supra,57 T.C. at 861; Dallmeyer v. Commissioner,14 T.C. 1282, 1292 (1950). *359 Generally, a taxpayer's unsupported self-serving testimony that a debt is uncollectible is not sufficient proof of worthlessness, Dustin v. Commissioner,53 T.C. 491, 502 (1969), affd. 467 F. 2d 47 (9th Cir. 1972), and petitioners have not even offered that. Petitioners have failed to prove the worthlessness of any of the purported debts, or the worthlessness of their various capital investments. Sec. 166(e); sec. 165(g). Citing section 465, petitioners seem to argue that they are entitled to bad debt deductions because they had money "at risk" in their various business ventures. Quite to the contrary, section 465 is a provision that limits otherwise allowable losses. Section 465 does not create a new type of deduction and is not a carteblanche for deductions anytime a taxpayer has invested money subject to general business risks. Petitioners are not entitled to any of their claimed bad debt deductions disallowed by respondent. III. Depreciation
Since the late 1960's, Mr. Parsons has been a licensed real estate broker in Kentucky. *360 In 1969, petitioners purchased a modular home for $18,000. Their purchase price was discounted because Mr. Parsons agreed to act as a salesman for the home manufacturer. Mr. Parsons used petitioners' home as a model, showing it to prospective customers. Petitioners used the entire modular home as their personal residence throughout the years in issue. Petitioners allocated one-half of the purchase price of the modular home ($9,000) to Mr. Parsons' real estate business and the other one-half to petitioners' personal residence. Using a $9,000 depreciable basis and a 10-year useful life, petitioners claimed straight line depreciation of $900 per year in 1974, 1975, and 1976, on their modular home, reporting it on a Schedule "C" that identified Mr. Parsons' business as real estate. Section 167(a) allows a deduction for the depreciation or exhaustion of (1) property used in a trade or business or (2) property held for the production of income. Although claiming depreciation, petitioners reported no gross income from Mr. Parsons' real estate business on their Schedules "C" for 1974 through *361 1976. Since the modular home was built in 1969, Mr. Parsons has shown it to no more than six to 10 prospective purchasers. Mr. Parsons has not sold a single modular home. Petitioners' business activities with respect to this modular home are far too sporadic to rise to the level of a trade or business. See Higgins v. Commissioner,312 U.S. 212 (1941); Groetzinger v. Commissioner,82 T.C. 793 (1984). Although Mr. Parsons may have had other real estate activities, there is no evidence in the record of any of them beyond Mr. Parsons' vague testimony that he made his last real estate sale sometime before February of 1976. We cannot characterize Mr. Parsons' efforts in selling modular homes (like the one in which he lived) as part of a larger integrated real estate trade or business, particularly since the returns for 1974 through 1976 show no gross receipts from his purported trade or business. [10] Petitioners are not entitled to their claimed deductions for depreciation on their modular home. *362 IV. Dividend
During 1975, Mr. Parsons was vice president and a 33-1/3 percent stockholder of Brushy Creek Coal, Inc. ("Brushy Creek"). During 1975, Mr. Parsons received a 1974 Ford pickup truck from Brushy Creek. Mr. Parsons gave no consideration for the transfer of the truck to him. In his statutory notice, respondent determined that Brushy Creek's distribution of the truck was a dividend to Mr. Parsons. Respondent determined the fair market value of the truck, and the amount of the dividend to Mr. Parsons (see sec. 301(b)(1)(A)), to be $4,000, the amount of depreciable basis claimed by Mr. Parsons when he placed the truck into service in 1976 in his farming business. Mr. Parsons now concedes that his receipt of the truck was a dividend, but he disputes the fair market value at the time of distribution. See sec. 301(b)(3). The sticker price on the truck when Brushy Creek bought it in 1974 was $4,517.20, although it may have paid less than that. Brushy Creek, engaged in strip mining, used the truck to pick up replacement parts for broken down equipment. Brushy Creek's drivers went as far as Charleston, West Virginia and Lexington, Kentucky to get parts. Mr. Parsons *363 testified that when he received the truck in 1975, it had over 75,000 miles on it, and that it was in extremely poor repair. He estimated its value at that time at $250 to $500. Mr. Parsons explained his 1976 claimed depreciable basis of $4,000 for the truck as representing inflation during the intervening period and amounts he expended repairing the truck. However, inflation does not increase basis and the only documented expenditure prior to or contemporaneous with his placement of the truck into service was approximately $140 spent on tires in December of 1976. [11] We also note that Mr. Parsons' graphic description of the poor condition of the pickup is inconsistent with the fact that he claims to have put it into service in 1976 in his farming business. Brushy Creek bought the truck in 1974 for $4,000-$4,500 and used it extensively before distributing it to Mr. Parsons. We believe that Mr. Parsons expended some money repairing the truck before *364 placing it into service in 1976. His claim that he spent between $3,500 and $3,750 is almost wholly unsubstantiated and appears to us grossly inflated. Exercising our best judgment, and resolving all doubts and inexactitude against petitioners, we conclude that the fair market value of the truck when Mr. Parsons received it was $3,000 before reduction by the dividend exclusion of section 116. Cohan v. Commissioner,39 F. 2d 540 (2d Cir. 1930). Therefore, he had dividend income of $2,900 in 1975. To reflect the foregoing and the parties' concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in question, and all references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. Petitioners make no such claim regarding the second consent form, signed on November 9, 1978. However, it is clear that if the first consent was not validly executed, the second would be ineffective because it was signed after expiration of the three-year limitations period. Sec. 6501(c)(4)↩; sec. 301.6501(c)-1(d), Proced. & Admin. Regs. 3. See also Cindrich v. Commissioner,T.C. Memo. 1984-294; Lefebvre v. Commissioner,T.C. Memo. 1984-202; Rault v. Commissioner,T.C. Memo. 1982-283; Price v. Commissioner,T.C. Memo. 1981-693; Jarvis v. Commissioner,T.C. Memo. 1980-381↩. 4. See Price v. Commissioner,supra;Robertson v. Commissioner,T.C. Memo. 1973-205↩. 5. See Robertson v. Commissioner,supra.↩
6. On this basis alone, petitioners' claim is clearly distinguishable from the taxpayers' claim in Robertson v. Commissioner,supra. In that case, the taxpayers' first contact with IRS officials concerning their tax liability for the year in issue came barely twoweeks before the limitations period was due to expire, and their execution for the consent form was barely oneweek↩ before the three-year period ended.
7. See also Estate of Rapoport v. Commissioner,T.C. Memo. 1982-584↩.
8. Since we cannot find any bona fide debt in any of these ventures, respondent's allowance of a nonbusiness bad debt for the $6,000 advanced to Ken Hobbs Coal Company was improper. However, while respondent made a reservation at the trial as to this item, respondent did not ask to be relieved of that determination.↩
9. See Stark v. Commissioner,T.C. Memo. 1982-639↩.
10. Petitioners have not argued that Mr. Parsons' efforts to sell modular homes constitute an activity engaged in for profit under section 212, so we need not address this question. We note, however, that in light of the absence of any gross income, Mr. Parsons' minimal efforts, and the personal nature of the modular home as petitioners' residence, petitioners would have difficulty establishing the requisite profit objective. See Sec. 1.183-2(b), Income Tax Regs.; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981); Jasionowski v. Commissioner,66 T.C. 312, 318-319↩ (1976).
11. The other documented repair, primarily a replacement transmission and labor, occurred in 1977 and, thus, would not constitute part of the claimed $4,000 depreciable basis for 1976, when Mr. Parsons put the truck into service.↩