BARNETT W. FRANKS AND ROSE FRANKS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
FRANKS v. COMMISSIONER
Docket No. 11698-86
United States Tax Court
T.C. Memo 1990-189; 1990 Tax Ct. Memo LEXIS 208; 59 T.C.M. (CCH) 380; T.C.M. (RIA) 90189; April 10, 1990
Donald P. Zedler, for the petitioners. James M. Klein, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined deficiencies in petitioners' Federal income tax as follows: Year
Deficiency
1977
$  4,982 1978
8,929 1979
17,369 1980
25,385 Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect *211 for the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: 1) whether petitioners are entitled to a theft loss deduction in 1978 under section 165(e); and 2) whether petitioners are entitled to a nonbusiness bad debt deduction in 1978 under section 166. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Barnett W. Franks and Rose Franks are husband and wife. On the date petitioners filed their petition in this case, they resided in Scottsdale, Arizona. [2] Petitioner Rose Franks had little involvement in the transactions at issue in this case, and all references to petitioner in the singular henceforth are to petitioner Barnett W. Franks, while references to petitioners in the plural are to both spouses. *212 Petitioner is a lawyer who was admitted to practice law in the State of Wisconsin in 1967. After his admission petitioner opened a law office in Milwaukee, Wisconsin, and engaged in a general practice as a sole practitioner. Petitioner handled the finances for his law practice, writing checks, balancing the checkbook, and making most of the deposits. Petitioner employed a secretary to attend to his correspondence, clerical work, phone calls, and appointments. As reflected on the spouses' joint individual income tax returns in evidence, petitioner's law practice generated an increasing amount of income from 1971 through 1973: Taxable Year:
1971
1972
1973
Net Profit Per
$ 47,443.02
$ 64,319.03
$ 70,907.00
Schedule C
During this same period petitioners had little debt, only a small mortgage on their home. Petitioners had substantial savings but the record does not disclose the amount. See n.3, infra. 1974 -- Petitioner Meets Joseph Talayka and Begins "Investing" in Silver Sometime in 1974 a mutual friend introduced petitioner to Joseph Talayka (hereinafter "Talayka"), the proprietor of C&T Coins. Talayka had begun selling coins out *213 of his basement in 1960, and had moved the business into a store (the coin shop) in 1970. Talayka bought and sold stamps, antiques, jewelry, and silver coins in the coin shop. He had two teletypes on the premises, linked up to a network over which coin dealers transacted purchases and sales. Talayka also engaged in silver futures transactions on exchanges during the years before the Court, and conceded that he "played the market" on both the New York and Chicago commodity exchanges. After meeting Talayka, petitioner began visiting the coin shop a couple of times a month. He would browse in the shop, converse with Talayka, and watch Talayka operating the teletypes. Petitioner and Talayka eventually developed a friendship. At some point in 1974, Talayka offered petitioner an opportunity to make a profit on transactions involving the purchase and sale of bags of silver coins. Petitioner understood the transaction to be essentially a financing arrangement: a dealer with large silver coin inventories would need cash; an "investor" would "buy" bags of silver coins from the dealer for a specified term of 30, 60, or 90 days or perhaps longer; the dealer would deliver the silver to *214 a bonded warehouse for safekeeping; the "investor" would "sell" the bags of silver back to the dealer at the end of the contract period at a prearranged price; warehousing, insurance, and transportation costs would be deducted out of the investor's "profits" on the transaction. Talayka proposed that he and petitioner invest in such "silver contracts" together. Talayka would enter into the contracts in the name of C&T Coins on behalf of both of them. Petitioner liked the proposal and decided to participate. When details of potential silver contracts came to Talayka's attention, he would inform petitioner either in person at the coin shop or over the telephone. Petitioner would consider the terms and would either agree or refuse to participate. Petitioner's earliest transactions with Talayka were relatively small and, in fact, generated a profit. Talayka paid these initial profits to petitioner but "rolled over" the principal into new silver contracts, obtaining either petitioner's prior consent or subsequent ratification. Actual silver contracts took place only during the first six months of petitioner's transactions with Talayka. Bolstered by what he regarded as this initial *215 modest success, petitioner decided to increase the amount he invested in silver contracts. During 1974, petitioner transferred funds to Talayka out of his and his wife's savings, expecting Talayka to invest this money in silver contracts. Petitioner may have maintained records documenting these transfers but, if so, he did not preserve them. The record does not establish the amount of family savings petitioner transferred to Talayka. [3]
In January 1974, a recently widowed client, Judith M. Bloom, had given petitioner *216 a plenary power of attorney over certain assets belonging to her and her minor children. Late in 1974, petitioner, unbeknownst to Mrs. Bloom, "borrowed" $ 90,000 of her funds. Petitioner's transfer of Mrs. Bloom's funds to himself was done without the knowledge or consent of Mrs. Bloom, who was out of the country at the time. Also, in 1974 petitioner borrowed $ 15,000 from "a dear friend," Dr. Richard A. Kaimann, giving Dr. Kaimann a promissory note reflecting the $ 15,000 principal along with a specific rate of interest and a term of less than one year. Moreover, as early as 1974 petitioner also borrowed $ 15,000 from his sister, Edith Mayer. Finally, the net profit from petitioner's law practice increased to $ 76,605.81 in 1974. Petitioner may have transferred funds to Talayka from these various sources, but the record does not establish the source of the various funds transferred to Talayka or how much was transferred to Talayka for silver transactions. On their joint income tax return for 1974, petitioners reported as interest income $ 3,712.50 from Talayka. They also reported other interest income totaling $ 8,389.05 from banks and other individuals. Meanwhile, back *217 at the coin shop during this same period, Talayka was negotiating deals. The actual structure of the early silver deals did not comport with petitioner's understanding of the silver transactions. Rather than "buying" silver coins and "selling" those coins back to the original "seller" at a specific future date, as he represented to petitioner, Talayka was selling coins to dealers across the country under forward contracts and purchasing the physical coins to meet delivery from customers who came into the coin shop. Talayka used petitioner's money in two or three of these transactions. The record does not establish whether or not any of these transactions were conducted through commodity exchanges.
1975 and 1976 -- Talayka Begins to Use Petitioner's Funds to Operate the Coin Shop and the Bowling Alley
Sometime in 1975, about six months after petitioner began participating in the silver transactions, Talayka lost 30 bags of silver, worth a total of $ 90,000, in a theft at Kennedy Airport in New York. Some of petitioner's funds had been used to buy this silver. While insurance covered the loss, Talayka did not receive payment on his claim for six months. That silver transaction *218 was the last one in which Talayka used petitioner's funds for an actual purchase of silver. While Talayka was waiting to receive the insurance reimbursement for the stolen silver, a bowling alley in which he had an interest was experiencing chronic cash flow problems. Talayka was strapped for funds to keep the bowling alley operating and decided to make petitioner a patron of the sport, without petitioner's knowledge. Talayka persuaded petitioner to "invest" in larger silver contracts. Drawing on his knowledge of genuine silver transactions that he had learned of over the teletypes, Talayka began concocting phony silver transactions. When Talayka needed more money to continue operating the bowling alley, he would contrive another phony "silver transaction" for petitioner. When petitioner brought Talayka additional money, Talayka would use some of it to transfuse the bowling alley and would use the remainder of the money to operate C&T Coins. Petitioner parted with his money on a handshake and did not demand from Talayka any written confirmation of either petitioner's transfer of funds to him or Talayka's purported transfer of those same funds to silver dealers. [4] Petitioner *219 accepted uncritically Talayka's avowals that he was reinvesting previously transferred funds into new silver contracts for petitioner. Petitioner as a lawyer even handled some collection matters for Talayka without suspecting or learning that the debts owed to Talayka stemmed from other business transactions into which Talayka had diverted petitioner's money. *220 Petitioner learned sometime prior to August of 1976 that his health was failing him. He needed open heart surgery. Petitioner recognized that he would not be able to begin practicing law again immediately after his surgery. In July or August of 1976 petitioner and another attorney, Seymour Pikofsky (hereinafter "Pikofsky"), incorporated their practices into one entity, Franks and Pikofsky, P.C. During this period Pikofsky and petitioner purchased a duplex on the east side of Milwaukee. Each man paid one-half of the down payment and owned an undivided one-half interest in the property. Pikofsky and petitioner both signed the mortgage papers, and orally agreed to divide any profit from the duplex equally between themselves. At the time of the purchase Pikofsky and petitioner opened a checking account (the joint venture account) to handle the collection of rent, payment of the mortgage, maintenance, etc. Pikofsky occasionally drew checks on the joint venture account on petitioner's behalf with petitioner's separate funds. Petitioners reported a net rental loss from the duplex on their 1976 joint income tax return. Petitioner underwent open heart surgery on August 17, 1976, during *221 which he was injured. Petitioner's vocal chords were permanently damaged by the anesthesiologist in connection with an endotracheal intubation procedure. The injury to his vocal chords substantially impaired petitioner's ability to speak, and impaired his ability to carry on the general practice of law. The heart surgery itself was successful. Petitioner subsequently filed a medical malpractice suit in regard to the injuries to his vocal chords. In 1975 the net profit reported from petitioner's law practice had decreased 51 percent, from $ 76,605.81 to $ 37,637.88. However, in 1975 petitioner reported interest income of $ 16,604 from Talayka. In addition, again unbeknownst to Mrs. Bloom, petitioner transferred $ 23,000 of the Bloom children's funds to himself. In 1976, the net profit from the law practice decreased another 27 percent, to $ 27,433. In 1976, petitioner reported interest income of $ 7,072 from Talayka and interest of $ 3,600 from a loan to another friend, Joe D. Wagoner (hereinafter "Wagoner"). During this period petitioner received from Wagoner a partial repayment of loans in the principal amount of $ 36,000. Petitioner drew checks on his law practice account *222 to Talayka in the total amount of $ 32,643.94 during this period as follows: Date
Check No.
Amount
12/29/75
5487
$  9,000.00
01/22/76
6087
4,000.00
03/01/76
6126
4,643.94
11/13/76
6018
15,000.00
Petitioner also drew checks on his law practice account in the amount of $ 2,600 to Judith Bloom and her children in 1976 as follows: Payee
Date
Check No.
Amount
Judith Bloom
07/03/76
5859
$ 2,040
09/13/76
5961
200
Rena Bloom
07/03/76
5860
160
Marsha Bloom
07/03/76
5861
200
Petitioner regarded these amounts as interest payments for his use of the Blooms' funds, and deducted these payments on his tax return. [5] Neither Judith Bloom nor her children knew anything about these checks. Petitioner endorsed these checks under the Blooms' power of attorney and deposited the funds into their accounts. *223 1977 -- The Loans and the Internal Revenue Service Investigation
On January 29, 1977, petitioners sold their home. The gross receipts from the sale amounted to $ 66,500. Petitioner decided to invest the proceeds in a silver contract. Petitioner visited the coin shop to inquire whether a suitable transaction might be available. Talayka replied that nothing was presently available but requested petitioner to lend him the money until something arose. Petitioner agreed to lend the money and gave Talayka check No. 6098, dated January 29, 1977, payable to C&T Coins in the amount of $ 75,000 and drawn on petitioner's law practice account. Part of that $ 75,000 check came from the proceeds of the sale of the family residence. Talayka agreed to pay interest on the $ 75,000. Up to this time petitioner had conducted his financial dealings with Talayka on a handshake. On this occasion, however, petitioner prepared a document for Talayka's signature which stated as follows: SECURITY AGREEMENT
Joseph Talayka, d/b/a C&T Coins, at 4716 West Center Street, in the City and County of Milwaukee, State of Wisconsin, does by these presents give and grant a security interest and *224 lien to Barnett W. Franks, of Milwaukee, Wisconsin, in all of the coins, stamps, supplies, furniture and fixtures, and equipment and all other contents located at the above address of the said C&T Coins, plus a security lien on the proceeds of the sale of all of the aforementioned, together with a security lien on all accounts receivable and after acquired property. This lien will cover all present and future indebtedness. This security lien is given in consideration of investments totalling $ 302,000.00 as of the date below. In witness whereof, I have hereunto affixed my hand and seal at Milwaukee, Wisconsin, on this 29th day of January, 1977. Talayka signed the document (the 1977 security agreement). In June or July of 1977, Talayka approached petitioner with another phony silver transaction involving a purported $ 155,000 contract price. Petitioner agreed to discharge Talayka's indebtedness on the $ 75,000 loan in return for Talayka's agreement to invest the funds on petitioner's behalf in the silver contract. Petitioner also transferred $ 40,000 to Talayka by way of check No. 6181, dated June 16, 1977, drawn on petitioner's law practice account. In addition, at *225 petitioner's direction Pikofsky transferred $ 30,000 of petitioner's money to Talayka by way of check No. 135, dated June 16, 1977, drawn on the joint venture account. The $ 70,000 in additional funds in June of 1977 was made up, in part, of some of a $ 23,715 inheritance petitioner's wife had received in 1977, a $ 40,000 loan from M&I Northern Bank to petitioner, and another $ 15,000 loan from petitioner's sister. Talayka agreed to pay a portion of the purported silver contract price. Back in 1976 Talayka had taken on a partner, Robert Dyar (hereinafter "Dyar"), at the coin shop. From June through December of 1977, Dyar managed the coin shop's day-to-day operations while Talayka spent most of his time overseeing operations at the bowling alley. In June and July Talayka only visited the coin shop once a month. From August until December Talayka visited the coin shop at least once a week. Talayka's son, however, was working at the coin shop during this period. In October of 1977 petitioner agreed to lend Talayka an additional $ 50,000 to buy Hummel figurines for the holiday sales season. Talayka agreed to pay interest on the loan at a rate in excess of that which petitioner *226 would pay to borrow the money from a bank. Petitioner borrowed the $ 50,000 to lend to Talayka from the Midland National Bank. Petitioner transferred the funds to C&T Coins by way of check No. 148, dated October 19, 1977, drawn on the joint venture account. At least part of this money was, in fact, used to purchase Hummel figurines. Petitioner subsequently repaid Midland National Bank in full for this loan. The injury to his vocal chords during surgery in 1976 had greatly impaired petitioner's earning potential as an attorney. Petitioner reported gross receipts of only $ 422 and a net loss from his law practice on his Schedule C for 1977. He also reported $ 25,300 as salary that year. He also reported $ 5,142 as interest income from Talayka that year. In addition, petitioners reported $ 2,218 in other interest and dividend income, $ 28,767 of capital gain from the sale of their residence, [6] and $ 24,001 of capital gain from the fall 1977 sale of the duplex petitioner and Pikofsky had owned. Petitioners elected section 1034 nonrecognition treatment for the gain on the sale of their residence. *227 In addition, during 1977 petitioner received the remainder due on the loans of $ 36,000 to Wagoner. Petitioner also drew checks on his law practice account in the total amount of $ 22,059.99 to Judith Bloom and her children during 1977 as follows: Payee
Date
Check No.
Amount
Judith Bloom
1/14/77
6078
$ 3,400.00
7/05/77
6200
3,600.00
8/01/77
6219
240.00
Rena Bloom
1/14/77
6080
4,186.66
8/01/77
6215
4,500.00
8/01/77
6216
500.00
8/01/77
6217
200.00
Marsha Bloom
1/14/77
6079
5,233.33
8/01/77
6218
200.00
Petitioner regarded these amounts, in part, as interest payments for his use of the Blooms' funds and, in part, as principal repayments. He deducted $ 8,060 on his tax return as interest expense. Petitioner endorsed these checks under the Blooms' power of attorney and deposited the funds into their accounts. Judith Bloom and her children knew nothing about these checks at the time and only learned about them in 1978 or 1979. Sometime in 1977 Frederick C. Stieber, an Internal Revenue Service Special Agent with 30 years of experience, interviewed petitioner regarding his transactions with Talayka. Special Agent *228 Stieber was investigating Talayka's business dealings for evidence of criminal violations of the Internal Revenue Code. Petitioner understood that Talayka, not petitioner, was the subject of Special Agent Stieber's inquiries. The Internal Revenue Service initiated the investigation based on information it had found in the coin shop's records. Special Agent Stieber took notes during his interview with petitioner. Shortly thereafter Special Agent Stieber drafted an affidavit for petitioner's signature based on his notes of the interview. The relevant portions of the draft affidavit provide as follows: During the years 1974, 1975, and 1976 I had many business dealings with Joseph Talayka d/b/a C&T Coins. I bought and sold silver contracts through C&T Coins during these years. I also loaned Joseph Talayka sums of money at 7% interest. The money I loaned to Talayka is covered by a note. The following schedule sets forth the amount of money that Talayka owed me as of December 31, 1974, 1975, and 1976. Date
Amount
12/31/1974
$  80,000.00
12/31/1975
$ 100,000.00
12/31/1975 [sic]
$ 115,000.00
Talayka did not owe me any money as of December 31, 1973. *229 In addition, I have invested with Joseph Talayka the sum of $ 90,000 at 7% for a client of mine, Judith M. Bloom, who resides * * * [portion illegible] This money was given to Talayka in 1975. The amount Talayka owed Judith Bloom as of December 31, 1975, and December 31, 1976 was $ 90,000. I have also invested with Talayka the sum of $ 15,000 at 7% interest for a client Dr. Richard A Kaimann. This investment was made in 1975 and Talayka owed Kaimann the sum of $ 15,000 as of December 31, 1975 and 1976. Before Special Agent Stieber had an opportunity to request petitioner to sign the affidavit, the Internal Revenue Service determined that it had insufficient evidence to support criminal prosecution against Talayka. Accordingly, Special Agent Stieber never requested petitioner to sign the affidavit. There is no probative evidence in the record to show that petitioner was investing the funds of Judith Bloom and her children on their behalf. [7]
*230 1978 and Beyond -- Talayka Skips Town and the Scam Unravels
The new year brought the beginning of the end for the coin shop. On January 2, 1978, John Malowsky, an attorney representing Dyar, telephoned Talayka to inform him that Dyar wished to end their partnership. Talayka attempted unsuccessfully to contact Dyar to discuss Dyar's decision. On January 15, 1978, Malowsky met with Talayka and asked him to sign a dissolution agreement. In January of 1978, petitioner directed Talayka not to reinvest any more of petitioner's funds. Petitioner told Talayka that petitioner wanted to start withdrawing his investment funds as contracts came due. Petitioner also requested the immediate return of $ 125,000. Talayka responded that he could not raise the $ 125,000 immediately but that he might be able to repay $ 75,000 at that time. Then, on January 28, 1978, petitioner visited the coin shop. Talayka drew three checks totalling $ 75,143.34 payable to petitioner on the coin shop's checking account at the M&I Northern Bank as follows: Date
Check No.
Amount
1/28/78
530
$ 24,263.34
1/28/78
532
467.50
1/28/78
534 50,412.50
When petitioner received these *231 checks, he believed that check No. 530 represented repayment for a silver contract that had come due, plus the earnings on the silver contract, plus interest on funds Talayka had borrowed from petitioner. Petitioner believed that checks Nos. 532 and 534 represented an interest payment and a principal repayment for the $ 50,000 petitioner had lent to Talayka to purchase Hummel figurines in 1977. The coin shop's checking account had a negative balance when Talayka drew these checks, however, and the checks were never honored. On this January 28, 1978, visit to the coin shop, petitioner brought with him a demand note in the amount of $ 350,000 bearing interest at a rate of eight and one-half percent. Talayka signed the demand note on the spot. Petitioner also brought with him a financing statement and a chattel security agreement covering [a]ll [of the coin shop's] coins, stamps, antiques, jewelry, artifacts, equipment, furniture, fixtures, and accounts receivable * * * and all accessions to, and spare and repair parts, special tools and equipment and replacements for, and all proceeds of the foregoing, * * * and all equipment of the same type or kind acquired by Debtor after *232 date, and its proceeds. Talayka signed these documents on the spot, as well. Petitioner returned the 1977 security agreement to Talayka at this time but retained a photocopy. Talayka's source of operating funds had dried up. He was frustrated and depressed. He had many creditors. Also, he had an outstanding gambling debt at the Sands Hotel in Las Vegas and owed money to a coin dealer in Arizona. Talayka removed from the coin shop's safe three bags of silver coins worth approximately $ 10,000 and key coins [8] worth approximately $ 25,000. Then, Talayka locked the coin shop and decided to "go west." At the time he departed the shop, the display cases contained key coins worth $ 75,000. Talayka did not take any coins out of the display cases. Apart from the key coins and bags of silver he had removed from the safe, Talayka left the store in its normal condition. Next, Talayka wrote a letter to petitioner, explaining that there were no silver contracts from which to recoup *233 petitioner's funds. Talayka apologized for his inability to repay petitioner. Talayka offered to give petitioner a power of attorney to sell the contents of the coin shop so that petitioner could recover the money Talayka owed him. Talayka included the key to the coin shop with the letter, mailed the letter to petitioner, and then left town. Talayka was out of town for approximately 31 days. He traveled west to California, sold some of the coins, sent $ 15,000 to the Sands Hotel to pay off his gambling debt, and sent some $ 9,000 to the coin dealer in Arizona. During Talayka's absence, M&I Northern Bank refused to honor the three checks Talayka had given to petitioner. On February 18, 1978, petitioner responded to Talayka's letter, refusing the power of attorney Talayka had offered him and informing Talayka that petitioner intended to commence legal action. On February 27, 1978, petitioner filed the January 28, 1978, financing statement and chattel security agreement with the Wisconsin Secretary of State. Four people had keys to the coin shop during Talayka's absence: petitioner, Virginia Eiser (Talayka's secretary), Dyar, and Fran Newly (an employee). An alarm system *234 provided the coin shop added security. An alarm company monitored the alarm system, and anyone wishing to gain access to the coin shop had to provide a code number to the alarm company first. The alarm company kept a record of people who entered the shop. The record in this case does not disclose who entered the coin shop during Talayka's absence. Talayka returned to Wisconsin on February 28, 1978. After repaying his debts to the Arizona coin dealer and the Sands Hotel, he still had $ 4,000 in either cash or coins in a suitcase, which he gave to petitioner. Talayka's creditors threw him a welcoming party: on the day of his return an involuntary petition in bankruptcy was filed for Messrs. Talayka and Dyar, d/b/a C&T Coins, Case 78-302, in the Bankruptcy Division of the United States District Court for the Eastern District of Wisconsin. The court appointed Jack U. Shlimovitz (hereinafter "Shlimovitz") as receiver for C&T Coins and for Talayka. Shlimovitz attempted to get into the coin shop and learned that petitioner had a key. Petitioner met Shlimovitz at the coin shop and opened the door. Once inside, Shlimovitz discovered that everything was in disarray. Someone had *235 taken the coins out of the revolving coin cases and had dumped them into two big boxes. Shlimovitz revisited the coin shop on February 28, or March 1 or 2 with Talayka. At that time Talayka confirmed that racks and drawers of coins belonging to investors [9] were missing from the back room. At a later date Shlimovitz brought the coin shop employees back to catalogue the coins. The remaining coins turned out not to have any special numismatic value. C&T Coins' key coins were all missing except one coin Shlimovitz found on the floor of the shop. Shlimovitz never found the remainder of the key coins that should have been on the premises. Talayka had kept a ledger account with a running total of all amounts petitioner had transferred to him. Shlimovitz recovered Talayka's ledger. At the time of the trial in this Court the ledger was in Shlimovitz' office; that ledger was not produced at the trial and is not in the record of this *236 case. Petitioner testified that he kept a yellow pad on which he recorded a running total of the amounts he transferred to Talayka, but that he destroyed that record in frustration and anger. On April 13, 1978, Talayka filed a voluntary petition in bankruptcy, Case No. 78-572, in the Bankruptcy Division of the United States District Court for the Eastern District of Wisconsin. On January 18, 1979, the court joined Case No. 78-302 and Case No. 78-572 for administration and dismissed the involuntary petition against Dyar in Case No. 78-302. In addition, the court appointed Shlimovitz the trustee of the bankruptcy estates of both Talayka and the coin shop. Petitioner retained an attorney, Charles F. Schroeder (hereinafter "Schroeder"), to represent him in the bankruptcy proceedings involving Talayka and the coin shop. When Shlimovitz changed the coin shop's locks, he offered petitioner a key, but Schroeder declined the key on petitioner's behalf. On July 25, 1979, the Patients Compensation Panels of the Wisconsin Supreme Court awarded petitioner $ 650,000 compensatory damages for the injury petitioner had sustained to his vocal chords during his heart surgery. Petitioner used *237 a portion of this award to repay the money he had borrowed from Edith Mayer and Dr. Kaimann. Petitioner also fully repaid the funds he had transferred to himself from the accounts of Judith, Rena, and Marsha Bloom. In the fall of 1979 petitioner compromised for $ 20,000 his claimed security interest in the coin shop's assets. Subsequently, on January 2, 1980, [10] Schroeder filed on petitioner's behalf an unsecured claim in the bankruptcy proceedings for $ 420,000. The bankruptcy estates of Talayka and the coin shop distributed to their unsecured creditors two dividends totaling a little over 5 percent of the amounts claimed. The first dividend was $ 27,506.08, or roughly 4.938 percent of the $ 557,019.61 allowed amount of claims, and occurred on February 25, 1986. The second dividend was $ 2,194.14, or roughly .393 percent of the $ 557,019.61 allowed amount of claims, and took place on January 13, 1987. Petitioner's name did not appear on the schedule of distributee-creditors for either distribution to the unsecured creditors. Petitioner did not recover anything on his unsecured claim for $ 420,000. *238 On their 1978 income tax return petitioners reported a long-term capital loss of $ 130,000, which they described as loans to Talayka, d/b/a C&T Coins, during the years 1974-1977. [11] Petitioners also reported on their 1978 income tax return a $ 310,000 embezzlement loss, explaining that it was for silver contracts during 1977, that instead of buying the silver contracts Talayka had embezzled the money. Petitioners now claim an embezzlement loss for monies transferred to Talayka in the entire period from 1974-1977. The $ 310,000 embezzlement loss petitioners reported on their 1978 return resulted in their report of a net operating loss for the year. Petitioners carried this net operating loss back to their 1975, 1976, [12] and 1977 taxable years by way of *239 amended returns, and forward to 1979 and 1980 by way of their original returns for these latter two taxable years. In addition, the $ 130,000 long-term capital loss (nonbusiness bad debt) petitioners reported on their 1978 return resulted in their report of a long-term capital loss carryover for the taxable year. Petitioners carried this loss forward to their 1979 and 1980 taxable years. Also, having failed to roll over the gain on the 1977 sale of their home into a new home, petitioners reported this gain on the amended return in which petitioners carried their 1978 net operating loss back to the taxable year 1977 (second amended return). Finally, on their 1979 income tax return petitioners reported as long-term capital gain the $ 20,000 award they had received in 1979 in compromise of petitioner's claimed security interest in the coin shop's personal property. In his January 29, 1986, notice of deficiency, respondent disallowed petitioners' *240 embezzlement loss and long-term capital loss and resulting carrybacks and carryforwards. Moreover, respondent increased petitioners' 1977 taxable income by the $ 14,383 gain on the 1977 sale of their home and recharacterized as ordinary income the $ 20,000 settlement petitioners had reported as long-term capital gain in their 1979 taxable year. The gain on the sale of petitioners' residence was reported on their second amended return for 1977, whereas the determinations in the notice of deficiency were based on the figures in the first amended return. OPINION Section 165 -- Theft Loss
Section 165(a) permits taxpayers to deduct uncompensated losses sustained during the taxable year. Section 165(b) governs the amount of the deduction, while losses incurred by individual taxpayers are subject to additional rules contained in section 165(c). Both parties treat the loss here as one incurred in a transaction entered into for profit, though not connected with a trade or business, under section 165(c)(2). We agree with that characterization. Petitioners bear the burden of proving their *241 entitlement to a section 165(c)(2) loss deduction. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). In order to carry his burden, petitioner must first prove that he parted with something of value that belonged to him. In his reply brief respondent concedes that petitioner transferred substantial amounts of money to Talayka for investment purposes. Nonetheless, respondent contends that petitioner has failed to substantiate both the precise amounts and the origin of the transferred funds. Respondent also argues that Talayka returned a portion of petitioner's funds and that petitioner has not proven these amounts either. This perceived failure to substantiate the amounts Talayka allegedly transferred back to petitioner leads respondent to conclude that petitioner has not proven the basis of his investments. Petitioner, on the other hand, contends that he has substantiated the origin and precise amounts of the transferred funds with crystal clarity and that he received no return whatsoever on his investments with Talayka. The only two individuals with personal knowledge of the dollar amounts petitioner transferred to Talayka for investment purposes *242 were petitioner and Talayka. Both men testified that petitioner had, in fact, transferred substantial sums of money to Talayka for investment in silver transactions. However, the testimony of both men was lacking in specifics. Drawing on his memory of events that occurred 10 to 14 years prior to the date of the trial in this matter, petitioner described the transfers. Petitioner's memory was hazy, and he provided, at best, sketchy details. We did not find his generally vague, self-serving testimony particularly persuasive. Our reluctance to rely solely on petitioner's testimony is augmented by our view that a reasonable person, particularly an experienced attorney, would not transfer such purportedly large sums without keeping some records. Petitioner alleges that he transferred $ 310,000 to Talayka for investment in silver contracts over a four-year period. Petitioner did not keep any real records. He allegedly wrote the amounts on a yellow pad, which he allegedly later destroyed in anger and frustration. The Court simply did not believe that testimony. See n.4, supra. If petitioner chose to conduct his affairs essentially on a handshake, which we rather doubt, that *243 is his choice, but we are not required to accept his self-serving testimony without some documentation. As a practicing attorney, petitioner more than most taxpayers should have recognized the importance of documentation. Because of our strong impression that many of the figures petitioner testified about were to a large extent duplicative and in the absence of any normal financial records, we conclude that any embezzlement loss must be limited to those amounts for which there is some minimal documentation in the record. We now turn to that documentation. Petitioner contends that the 1978 demand note, chattel security agreement, and financing statement constitute conclusive proof of the amounts he had transferred to Talayka for investment purposes. This contention suffers from at least three defects. Firstly, the $ 350,000 total shown on the demand note included a portion (at least $ 75,000) of the $ 125,000 loan proceeds Talayka had received from petitioner. Secondly, when Talayka signed the demand note he was attempting to buy enough time to leave town before his ruse was discovered. The Court is satisfied he would have signed anything and also that anything he signed was about *244 as worthless as his word. The $ 350,000 total would also have included all of the phantom profits he had previously reported to petitioner and claimed to have rolled over into new investments. Thirdly, Talayka testified that the $ 350,000 total was derived from a running ledger account he kept. This ledger was in the bankruptcy trustee's possession at the time of trial. Petitioner knew of the ledger's existence, but there is no record of his having attempted to obtain it and enter it into evidence. The record reflects numerous sources of funds petitioner might have used (family savings, "borrowings" from the Blooms, loans from two "dear friends," loans from his sister, his wife's small inheritance, and his law practice) to make the transfer of funds to Talayka. What the record does not establish is that petitioner did in fact transfer funds from these sources to Talayka. Because we are satisfied that there is substantial duplication in the various amounts about which petitioner testified and because we are satisfied that not all of these amounts were transferred to Talayka, we conclude that generally only the documented transfers of funds to Talayka are allowable as an embezzlement *245 loss. We find that petitioner transferred a total of $ 102,643.94 to Talayka for investment in silver contracts as follows: Date
Account
Check No.
Amount
12/29/75
Law Practice
5487
$  9,000.00
01/22/76
Law Practice
6087
4,000.00
03/01/76
Law Practice
6126
4,643.94
11/13/76
Law Practice
6018
15,000.00
06/16/77
Law Practice
6181
40,000.00
06/16/77
Joint Venture
135
30,000.00
Regarding the sources of the funds, respondent essentially argues that Judith Bloom and Dr. Kaimann, not petitioner, should properly have reported the loss of any funds originating with them, because these funds were not petitioner's to lose. However, the record does not establish that petitioner made any investments on behalf of Mrs. Bloom or Dr. Kaimann. Respondent's argument concerning the deductibility of funds originating with Judith Bloom and Dr. Kaimann is moot, however. As indicated above, petitioner has failed to prove the particular source or sources of the funds transferred to Talayka. More importantly, petitioner has failed to prove that he transferred more than the $ 102,643.94 allowed above. However, the record shows that petitioner did make *246 some transfers to Talayka in 1974 and early 1975. For these earlier transfers petitioner simply has not provided this Court with sufficient evidence to determine other than some nominal amounts. Accordingly, applying the Cohan rule yet bearing heavily against petitioner "whose inexactitude is of his own making," we conclude that petitioner transferred an additional $ 5,000 to Talayka in 1974, and $ 5,000 in early 1975. Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Accordingly, we conclude that petitioner transferred a total of $ 112,643.94 to Talayka for silver investments in the period 1974 through 1977. Any embezzlement loss deduction cannot exceed that amount. Respondent's contentions concerning the basis of petitioner's investments -- that Talayka returned an indeterminate amount of investment capital and profits to petitioner, and, therefore, petitioner's inability to prove his investments' bases precludes a loss deduction -- are inaccurate. Petitioner lost money, not other property. His basis in this money was its face value as currency. There simply is no indication that petitioner failed to report and pay taxes on amounts properly reportable *247 as gross income in any year. Petitioner apparently reported as income both the real profits received on the early genuine silver transactions and the money Talayka gave him as phantom profits he had made on the fake transactions. We know that Talayka gave petitioner amounts of money from time to time to placate petitioner and to keep him from withdrawing from the "silver investments." We do not know exactly how much money was returned, but we have no reason to think that the amount exceeded the amounts petitioner reported on his tax returns as interest income from Talayka. After Talayka began fabricating phony silver contracts, he informed petitioner that he was rolling petitioner's investment capital and profit into new silver contracts. Other than the money Talayka gave petitioner, which petitioner reported on his tax return each year as interest income, petitioner did not receive any return of his investment capital until 1978. When Talayka returned to Wisconsin in 1978, he gave petitioner the suitcase containing $ 4,000 in coins and/or cash. The record provides little guidance for determining how much of this amount should be treated as a return of the funds petitioner *248 transferred to Talayka for investment in silver contracts and how much should be treated as a return of the amounts petitioner lent to Talayka. This dilemma alone will not preclude petitioner from deducting his losses, however. We find that of the $ 4,000 petitioner received in 1978, $ 1,896.01 was a return of petitioner's investment money, computed as follows: $ 112,643.94 (funds transferred for silver contracts) / $ 237,643.94 (total of loans and funds transferred for silver contracts) X $ 4,000 This $ 1,896.01 return reduces to $ 110,747.93 the proven net amount of Talayka's outstanding silver contract liability to petitioner at the end of 1978. Special rules apply to theft losses under section 165. While taxpayers are treated as having sustained other types of section 165 losses during the taxable year in which the losses occur, "theft" losses are deemed to have been sustained in the year they are discovered. Sec. 1.165-1(d)(1), Income Tax Regs.; sec. 165(e); and sec. 1.165-1(d)(3), Income Tax Regs.; Sec. 1.165-8(d), Income Tax Regs. *249 , defines the term "theft" to include "larceny, embezzlement and robbery." For Federal income tax purposes the determination of whether or not a theft has taken place is made pursuant to the law of the jurisdiction wherein the loss allegedly occurred. Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), affg. 61 T.C. 354 (1973); Monteleone v. Commissioner, 34 T.C. 688, 692 (1960). Petitioner need not show that Talayka was convicted of theft to prove his entitlement to the deduction. Monteleone v. Commissioner, 34 T.C. at 694. Neither party adverts to any issue concerning the occurrence of a "theft" for Federal income tax purposes, and we think there is no dispute. Petitioner has clearly proven a "theft," once Talayka began concocting the phony silver contracts sometime in 1975. [13] As relevant here, section 943.20(1) of the Wisconsin Criminal Code provides: (1) Acts. Whosoever does any of the following may be penalized as provided in sub. (3): * * * (d) Obtains title to property of another by intentionally *250 deceiving him with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme. Wis. Stat. Ann. sec. 943.20(1) (West 1958 and Supp. 1981). A transfer of "title" takes place when the defendant obtains the victim's money by false pretenses and exercises unauthorized control over it. State v. Hawkins, 94 Wis.2d 694, 289 N.W.2d 372 (Wis. Ct. App. 1979), cert. denied 95 Wis.2d 747, 293 N.W.2d 925 (1980). Herein, Talayka desired to part petitioner from his money so that Talayka could use the money to operate the bowling *251 alley and the coin shop. Talayka represented that he would invest the money on petitioner's behalf in silver transactions. When he made these representations to petitioner, Talayka did not intend to invest the money on petitioner's behalf in silver transactions. Talayka's false representations induced petitioner to part with his money. See n.4, supra. Talayka obtained "title" to petitioner's money within the scope of section 943.20(1)(d) of the Wisconsin Criminal Code when he used it to operate the coin shop and the bowling alley, thereby exercising unauthorized control over it. State v. Hawkins, supra.Thus, Talayka's actions violated section 943.20(1)(d) of the Wisconsin Criminal Code, and constituted "thefts" for Federal income tax purposes. Moreover, the record establishes that petitioner discovered Talayka's thievery in 1978 when Talayka closed the shop and mailed the note and key to petitioner. We have determined that petitioner sustained a $ 110,747.93 theft loss in 1978, [14] and is entitled to deduct this loss in 1978. *252 Section 166 -- Bad Debt Deduction
Section 166(d) allows noncorporate taxpayers to deduct nonbusiness debts that become worthless during the taxable year. [15]Section 1.166-5(a)(2), Income Tax Regs., delays the deduction until the nonbusiness debt becomes wholly worthless: noncorporate taxpayers cannot deduct nonbusiness debts that are partially recoverable during the taxable year. The amount deductible is the nonbusiness debt's adjusted basis provided by section 1.1011-1, Income Tax Regs., for determining the loss from the sale or other disposition of property. Sec. 1.166-1(d)(1), Income Tax Regs. Taxpayers must report nonbusiness bad debt losses as short-term capital losses. Sec. 166(d)(1)(B). Petitioner bears the burden of proving his entitlement to the section 166 bad debt deduction. Welch v. Helvering, 290 U.S. 111, 115 (1933); Rule 142(a). *253 In order to establish deductibility petitioner must prove the existence of a bona fide debt. A bona fide debt is a debt which arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. * * * Sec. 1.166-1(c)(1), Income Tax Regs. Petitioner has proven the existence of bona fide debt. We rely on the testimony of petitioner, Talayka, and Pikofsky, as well as check No. 6098, dated January 29, 1977, drawn in the amount of $ 75,000 on petitioner's practice account and check No. 148, dated October 19, 1977, drawn in the amount of $ 50,000 on the joint venture account. We find that petitioner lent money to Talayka in January and October of 1977. Petitioner and Talayka were debtor and creditor, and Talayka owed petitioner $ 125,000. See n.11, supra. Petitioner must also prove that 1978 was the proper year to report the deduction. Whether or not a debt became worthless during a given taxable year is a question of fact. Dallmeyer v. Commissioner, 14 T.C. 1282, 1291 (1950). *254 To determine the year of worthlessness, we look for the occurrence of objective landmarks signifying that the hope of any further recovery is lost. James A. Messer Co. v. Commissioner, 57 T.C. 848, 861 (1972). If property having more than a nominal value secures a nonbusiness debt, the debt is not wholly worthless and, therefore, is not deductible. Loewi v. Ryan, 229 F.2d 627, 630 (2d Cir. 1956); Orrell v. Commissioner, T.C. Memo. 1979-129. Accord, James A. Messer Co., supra, 57 T.C. at 860. On January 29, 1977, petitioner lent $ 75,000 to Talayka, and Talayka executed the 1977 security agreement. This security agreement covered all of the contents of the coin shop as well as all accounts receivable and after-acquired property. In December of 1978, after agreeing to accept $ 75,000 and to forebear immediate collection of the remainder of the $ 125,000 he had just demanded from Talayka, petitioner asked for and received a $ 350,000 demand note, and a financing statement and chattel security agreement reflecting an increased principal but covering the same coin shop assets. On February 27, 1978, petitioner *255 filed the January 28, 1978, financing statement and chattel security agreement with the Wisconsin Secretary of State. The record contains no detailed breakdown of the value of the property subject to petitioner's security interest. Nonetheless, petitioner compromised his security interest for $ 20,000 in the fall of 1979, so it stands to reason that the underlying property had a value of at least $ 20,000 at that time. In January of 1980, the attorney representing petitioner in the Talayka/C&T Coins bankruptcy proceedings filed on petitioner's behalf an unsecured claim against the bankruptcy estate for $ 420,000. Distributions to unsecured creditors out of the bankruptcy estate occurred in February of 1986 and January of 1987 and totalled $ 29,700.22, or approximately 5.3 percent of the allowed amount of claims. Petitioner did not share in these distributions. Petitioner's actions of both filing the financing statement and chattel security agreement with the Wisconsin Secretary of State in 1978 and asserting the validity of the interest well into 1979 manifest petitioner's belief that the debt Talayka owed him was not wholly worthless at the end of 1978. Moreover, petitioner's *256 ability to recover $ 20,000 in settlement of the security interest indicates that the assets securing the debt had more than a nominal value. Accordingly, petitioner has not proven that the $ 125,000 debt Talayka owed him was wholly worthless as of the end of 1978. Loewi v. Ryan, supra; Orrell v. Commissioner, supra.Accord, James A. Messer Co. v. Commissioner, supra.
Our conclusion that the debt was not worthless as of the end of 1978 denies petitioner the benefit of a bad debt deduction in 1978. The timing inquiry does not end here, however, since the years 1979 and 1980 are also before the Court. We know that the unsecured creditors who participated in the 1986 and 1987 distributions received approximately 5.3 percent of their allowed claims. [16] We also know that despite the January 2, 1980, filing of an unsecured claim for $ 420,000, petitioner did not participate in either of the two distributions to unsecured creditors. The record does not explain why. The fact that petitioner did not share in the distributions to unsecured creditors, however, indicates that Talayka's indebtedness to him had become worthless *257 at some prior time. Petitioner provided no evidence of the circumstances surrounding the filing or the disallowance of his unsecured claim. This evidentiary void would reduce to mere speculation any finding regarding the taxable year in which the debt became worthless. Accordingly, petitioner is not entitled to the claimed section 166 deduction in any of the years before us. As discussed above, $ 1,896.01 of the $ 4,000 in cash or coins Talayka gave petitioner in 1978 was a return of the capital petitioner had previously *258 transferred to Talayka for investment in silver contracts. This amount is not income. The proper income tax treatment of the remaining $ 2,103.99 Talayka gave petitioner in 1978 and the $ 20,000 petitioner received in settlement of his security interest in 1979 seems clear. These are repayments of loans petitioner had made to Talayka, hence a nontaxable return of capital. These amounts, of course, reduce the amount of petitioner's remaining nonbusiness bad debt to $ 102,896.01, whenever it finally became wholly worthless. If necessary, the parties can address these matters in Rule 155(b) proceedings. Decision will be entered under Rule 155. Footnotes
1. The deficiency determinations in petitioners' 1977, 1979, and 1980 taxable years stemmed from the disallowance of a carryback and carryforwards of the loss and bad debt from petitioners' 1978 taxable year.↩
2. In their petition, petitioners alleged (and respondent in his answer admitted) that their current legal residence was Scottsdale, Arizona. In the stipulation the parties stipulated that at the time of the filing of the petition, petitioners "maintained a residence at 8345 East San Bernardo Drive, Scottsdale, Arizona 85258, but retained↩ a residence and domicile in the State of Wisconsin." (Emphasis supplied.) It is not clear from the parties' rather ambiguous stipulation whether or not they intended this to be a stipulation as to petitioners' "legal residence" for venue purposes. See sec. 7482(b)(1)(A) and sec. 7482(b)(2).
3. While petitioner testified that he had $ 80,000 to $ 90,000 of savings at the beginning of 1974, there is a complete absence of any normal business or financial records to support his self-serving testimony. While the Court agrees that petitioner used some family savings in his silver transactions with Talayka, the Court does not accept petitioner's testimony as to the amount. The Court cannot determine the amount of any such savings, let alone the amount of such savings that was actually transferred to Talayka. The Court is satisfied that the various dollar amounts (of savings, loans, etc.) that appear in the record are, to a large extent, duplicative.↩
4. The Court does not believe that petitioner, an experienced attorney, was as gullible as he purported to be. Petitioner's failure to demand any documentation from Talayka contrasts sharply with his treatment of his long-time "dear friend," Dr. Kaimann, and his long-time "dear friend," Joe Wagoner. He had loaned Wagoner $ 36,000; that loan was fully documented, as were all loans to Dr. Kaimann. Talayka testified that petitioner "invested some of his money for me to play the market." The Court thinks petitioner knew that something more than the simple purchase-and-resale of bags of silver coins was going on, and that whatever petitioner believed was going on would probably help to explain why he was content to have no documentation of his transactions with Talayka. However, the Court does believe that petitioner was victimized by Talayka and that petitioner believed Talayka was using his money in some type of silver transaction, possibly silver futures contracts.↩
5. Petitioners had also deducted $ 1,598.67 as interest paid to Judith Bloom in 1974, and had deducted $ 3,354 as interest paid to Judith Bloom in 1975, and $ 766 as interest paid to the Bloom children in 1975. Neither Judith Bloom nor her children knew anything about these purported interest payments in 1974 and 1975.↩
6. In paragraph 12 of their stipulation, the parties stipulated that petitioners realized a gain of $ 14,383 on the January 29, 1977, sale of petitioners' personal residence. Petitioners originally reported a gain of $ 28,767 on the sale of their residence. The figure of $ 14,383 appears to be the taxable income↩ generated by the sale, computed by subtracting the capital gain deduction of sec. 1202 from the realized gain.
7. Special Agent Stieber was an experienced investigator and the Court does not question the accuracy of his notes or the draft affidavit he prepared. However, the Court thinks petitioner, as an attorney, would not have volunteered the information that he "borrowed" the Blooms' money without their knowledge and consent and was using their money for his own purposes.↩
8. A key coin is the centerpiece in a group of coins and has numismatic value far in excess of its value as currency. The coin shop's key coins ranged in value from $ 400 to $ 2,000 apiece.↩
9. These "investors" were persons selling their own coins under the "bid board" (a type of silent auction) procedure. These investors and these coins are unrelated to the "silver contracts" transactions (real or phony) between petitioner and Talayka.↩
10. While the parties stipulated that Schroeder filed the unsecured claim for $ 420,000 on January 9, 1980, the district court stamped the proof of claim filed on January 2, 1980.↩
11. Petitioner explained at trial that the $ 130,000 total long-term capital loss reported on the 1978 return consisted of the $ 75,000 loan petitioner made to Talayka in January of 1977, and the $ 50,000 loan petitioner made to Talayka in October of 1977. The total of these two loans is, of course, $ 125,000. During his testimony petitioner conceded the nondeductibility of the $ 5,000 difference between these amounts.↩
12. Petitioners requested the Court to determine overpayments in petitioners' 1975 and 1976 taxable years. In an order, dated November 4, 1986, the Court dismissed this matter for lack of jurisdiction with respect to these taxable years.↩
13. We do not understand petitioner to claim that there was an embezzlement loss as to the early actual silver contracts. Petitioner actually made some profit on those early contracts. Any embezzlement as to the early amounts transferred to Talayka, which we have found to be $ 5,000 in 1974 and $ 5,000 in 1975, occurred when Talayka later retained those amounts, allegedly rolling the amounts over into the phony silver contracts.↩
14. If at the end of 1978 petitioner had reasonable prospects of recovering further amounts in later years, he would be deemed to have sustained his theft loss in a later year. Sec. 1.165-1(d)(3), Income Tax Regs.↩ Respondent does not argue that the financing statement and chattel security agreement petitioner received from Talayka in 1978 gave petitioner such reasonable prospects, and therefore, we will not address the issue.
15. Petitioner does not argue nor does the evidence indicate that petitioner was in the business of lending money or that any loans to Talayka were somehow connected with petitioner's law practice. Accordingly, we view petitioner as having conceded that any loans he made to Talayka were "nonbusiness debt" as that term is defined in section 166(d)(2)↩.
16. If petitioner's claim had been allowed along with the others, it would have diluted the distribution percentage to approximately 3.04 percent as follows: $ 557,019.61
(total amount of claims actually allowed)
+
$ 420,000.00
(petitioner's claim)
$ 977,019.61
(total recomputed amount of claims)
3.04 percent
=
$  29,700.22
(total amount distributed)
977,019.61
(total recomputed amount
of claims)
Thus, petitioner's unsecured claim, if allowed, would have resulted in a recovery of approximately $ 12,768 ($ 420,000 X 3.04 percent). The forseeability of this recovery in 1980 is unknown.↩